# Mercer County *versus* The Pittsburgh and Erie Railroad Company.

Where an act of assembly authorized certain counties to subscribe to the capital stock of a railroad company, subject to the restrictions, limitations, and conditions therein expressed, and in no other way or manner whatever, and also enacted that such subscription should be made *after* and not *before* the same shall have been designated, advised, and recommended by a grand jury, and the amount of the subscription ordered and designated by the same grand jury, payable either in money or the bonds of the county; and the grand jury made a presentment recommending the commissioners of the county to subscribe to such stock, under such restrictions as may be required by the Act of Assembly authorizing the subscription, to an amount not exceeding $150,000; under authority of which two of the county commissioners subscribed $150,000 of stock, and executed and delivered bonds for the amount to the company; and the same act also provided that the acceptance of the same act by the railroad company should be deemed an acceptance by them of the provisions of an act passed on the 11th day of March, 1851, fixing the gauges of railroads in the county of Erie. *Held*—

1. That all discretionary power, touching the subscription, was given *exclusively* to the grand jury, and they could not transfer any part of it to the county commissioners or any other persons.

2. That it was imperative on the commissioners to make the subscription when the same should be advised and recommended, and the *amount* of it designated by the grand jury, in the manner required by the act.

3. That a recommendation by the grand jury, to the commissioners, to subscribe to such stock to an amount not exceeding a specific sum named, was not a compliance with the provisions of the act, and conferred no authority upon the commissioners to make any subscription whatever.

4. That such a subscription, made without any *designation* by the grand jury of the amount to be subscribed, was without any competent authority, and therefore void.

5. The law in force, when a proposal for a contract is made, forms a part of it, and if such proposal be not accepted until the law under which it is made is essentially changed, such acceptance comes too late, and the proposal falls with the repeal of the law which induced it.

6. Where the act authorizing the subscription provided that the acceptance of its provisions by the company should also be deemed an acceptance of

[Mercer County *v.* Pittsburgh and Erie Railroad Company.]

another act imposing certain restrictions on the corporation, and the latter act was repealed after the recommendation of the grand jury, and before the acceptance of the subscription by the company, the right to subscribe under the recommendation ceased, and no subsequent acceptance by the company, or subscription by the commissioners, was binding on the county.

7. Where the transaction is between individuals, subsequent assent and acquiescence would validate the contract, but where the grand jury were constituted the organ or agent of the county for the purpose, the acts of no other officers would be available to ratify the contract, or make it binding on the county.

8. The commissioners of the county, having no authority to *make* any subscription, would be equally incompetent to *ratify* an unauthorized one.

9. The inhabitants of a county, although entitled to great indulgence, may be affected by delay and acquiescence in the unauthorized acts of the public officers. Per LEWIS, C. J.

10. A party who has a contract with the company to receive the bonds in payment for work to be done in the construction of the road, and which party had full notice of the facts which rendered the subscription invalid, has no such equity as would prevent a decree for the cancellation of the bonds, and an injunction against negotiating them.

THIS was a bill in equity, at the suit of the County of Mercer against The Pittsburgh and Erie Railroad Company, and the officers and directors of the same company. The bill of the complainants charges that the railroad company was incorporated by virtue of an Act of Assembly approved the 21st April, 1846, with the powers and privileges therein contained, and those conferred by the several supplements thereto. And that on the 4th day of May, 1852, an Act of Assembly was passed, which, among other things, authorized the commissioners of the county of Mercer to subscribe for shares in the capital stock of the Pittsburgh and Erie Railroad Company. The certificates of loan, or bonds, that might be issued in payment of the stock subscribed, to bear an interest of 6 per cent. per annum, payable half-yearly. The subscriptions to be subject to the restrictions, limitations, and conditions contained in the act. *Such subscription to be made after, and not before the amount thereof should have been designated, advised, and recommended by a grand jury of said county.*

The grand jury of Mercer county at May Sessions, 1852, made the following presentment:—

" The grand inquest of the Commonwealth of Pennsylvania, inquiring in and for the body of the county of Mercer, at May Sessions, 1852, having taken into consideration the importance of the construction of the Pittsburgh and Erie Railroad, to the several counties, and the country through which it will pass : also, the tendency to advance the value of property, and develop the various resources of the county, would recommend that the commissioners of Mercer county subscribe to the capital stock of the Pittsburgh and Erie Railroad, to such amount, and under such restrictions as may be required by the Act of Assembly, authorizing them to subscribe stock to said road, to an amount not exceeding $150,000.

C. G. CARVER, Foreman."

[Mercer County *v.* Pittsburgh and Erie Railroad Company.]

Sometime in May or June, 1852, on application of the railroad company, Benjamin W. Pennock and John Loutzenhiser, two of the commissioners of Mercer county, subscribed on behalf of and in the name of the county of Mercer, to the capital stock of the company, 3000 shares of $50 each, amounting to $150,000, with a condition annexed that no part of said sum, or of the interest on it, should be paid by the county until the railroad of the company should be completed and the cars running upon the same. On the 5th September, 1853, James J. Duncan and Benjamin W. Pennock, two of the commissioners of the county, executed and delivered to the railroad company three bonds of $50,000 each, payable in twenty years, at 6 per cent. per annum interest, payable semi-annually. And on the 8th October, 1853, these bonds were exchanged for one hundred bonds of $1000 each, fifty of $500 each, and two hundred and fifty bonds of $100 each, payable at the same time as the former bonds of $50,000 each.

The bill further charges that by the act of incorporation, and before the charter of the company could be obtained and the corporation be organized, at least 15,000 shares of capital were to be subscribed, with $2.50 paid in on each share. And that at the time that the subscription of Mercer county was made by the commissioners, and at the time the bonds were executed and delivered as before stated, the company had upon its books certain shares of capital stock, subscribed by Charles M. Reed and others, of the city of Erie, amounting to $750,000 ; but the bill alleged that the $2.50 per share, required to be paid by the said act, were not paid, but that a note or obligation of Charles M. Reed was given for the same, which was never paid. And that the shares of stock subscribed by Reed and others, were subsequently, by a secret agreement among the stockholders of the company, in fraud of the county of Mercer, suppressed, and no assessments made upon them ; and that after the issue and delivery of the bonds of Mercer county, these shares of stock were treated as fictitious and unreal, and as forming no part of the capital stock of said company, but were transferred to unknown parties, to be held subject to the order of the board of directors, and to be transferred to such persons as could be induced to purchase them as new subscriptions to the stock of the company.

And the bill further alleged, that by the transfer and suppression of such stock prior, as the complainants believe, to the subscription of the county and the delivery of its bonds, the company had become insolvent and unable to build the road, and that in consequence the county was disappointed and deceived by the company in the prospect of the advantage to be derived from the road, by which it was induced to subscribe and issue the bonds.

The complainants further alleged that they had been informed and believed that a large amount of the bonds of the county had

[Mercer County *v.* Pittsburgh and Erie Railroad Company.]

been used for other purposes than the building of the road, and that a large portion of them were sold by the company for less than the par value of them, contrary to the act authorizing the subscription.

The complainants further charged that the subscription "was not recommended, designated, and ordered by the grand jury of said county, as required by law, and that the issuing of the bonds as aforesaid was contrary to the conditions of the subscription as made upon the books of the said company, and that the subscription of the said 3000 shares of stock of said company by said B. W. Pennock and Loutzenhiser, and the execution and delivery of the bonds as aforesaid, were procured by said company by promises of personal gain and advantage to the said commissioners of said county, making and delivering the same, to be bestowed and conferred upon them, the said county commissioners, by the said company, or by some of the directors and officers thereof, out of the funds of the said company." And alleged that in consequence of these facts a grievous fraud had been perpetrated upon the county, by which an onerous debt will be created and the taxes greatly augmented.

The bill then propounded numerous interrogatories to the officers, agents, and directors of the company, in reference to the matters charged, and concluded by a prayer for an order or injunction on the defendants, restraining them from issuing and paying out any of the bonds, and that it might be decreed that the subscription and the execution and delivery of the bonds were void acts, and the bonds were not obligatory on the county or the citizens thereof, and for such other and further relief as the nature and circumstances of the case should require, and for a writ of subpœna to the officers and directors therein named, to appear on a day certain, and full and true answers to make, and abide such further orders and decrees as to the court shall seem meet.

The bill was filed on the 13th May, 1856, and the motion for a preliminary injunction was heard on the 4th June, 1856, on the bill and affidavits, and was argued by

*Stephenson*, for complainants.

*Kunkel*, for respondents.

The motion for a preliminary injunction was denied, a rule granted on the defendants to answer by the first day of September, 1856, and a commissioner appointed to take the testimony.

On the 30th of October, 1856, the answer of defendants, by Thomas J. Power, the president, was filed. In this it was alleged that the subscription made by Charles M. Reed and others,

of Erie, and standing upon the books of the company at the time
the county of Mercer subscribed, was a *bona fide* subscription, and
that five *per centum* thereof was duly paid as required by law
into the treasury of the company by the subscribers, and all legal
requirements complied with by them: and that no illegal or fraudu-
lent transfer was ever made of it by them. That the whole trans-
action was entered upon the books of the company, which have
been open at all times to the inspection of all parties interested.
That the ability of the company to construct its road has not
been diminished or impaired by such alleged suppression or trans-
fer of stock, nor from any other cause; and that the company,
so far from being insolvent, is in a more prosperous condition than
at any former period of its existence, and especially at the time
of the subscription by the county of Mercer. That at their session
of 1856 the legislature granted to the Erie and North-East
Railroad Company certain powers and immunities, upon condition
that such company would subscribe $400,000 to the capital stock
of the defendants' corporation, or construct as much of the road
as would require an outlay of that sum, and which act has been
accepted by the Erie and North-East Railroad Company, which
would make that sum an available subscription to the defendants.
That in addition thereto the company has available subscrip-
tion to its stock by corporations and individuals equal to
more than $800,000, making its available resources more than
$1,200,000, a sum believed to be sufficient to complete the road,
and which, if not embarrassed by applications like the present,
suggested by hostile railroad interests, would secure its completion
in two years, or less time.

The respondents denied that any part of the bonds of the county
of Mercer were expended for any other purpose than the con-
struction of the road, and in no instance for less than the par
value. That about $65,000 of the bonds have been paid out to
contractors for work done on the road in Mercer county, and the
residue, about $85,000, remain in the hands of B. F. Baskin, the
treasurer of the company, and can only be paid out for the work
done on the road as it progresses, being specially pledged for the
construction of the road in Mercer county.

They further answered that the sum of two dollars and fifty
cents on each share subscribed by Charles M. Reed and others,
was paid in cash, as appears by the certificate of the Secretary of
the Commonwealth, appended to the answer, to which reference
was craved.

That the subscription of the county of Mercer was regularly
made in pursuance of the Act of Assembly authorizing it. A
regular and lawful presentment recommending it was made by the
grand jury of the county, and directing a subscription not exceed-
ing one hundred and fifty thousand dollars, and that the subscrip-

[Mercer County *v.* Pittsburgh and Erie Railroad Company.]

tion was made in pursuance of and in accordance with the directions of the grand jury to the amount of one hundred and fifty thousand dollars, and the county commissioners appointed William S. Garvin, Joseph Kerr,. and William G. Brown as managers or directors to represent the county of Mercer in the board of directors of the Pittsburgh and Erie Railroad Company in September, 1853. That these persons continued in office and performed the duties of directors of the company until superseded by the appointment of William Stewart and William Maxwell, to succeed them on the 6th of February, 1855. And that no promises or inducements of any kind were offered by the company, or by any person on its behalf, to the commissioners or any other person to procure the subscription or the delivery of the bonds. But that the making of the subscription and the delivery of the bonds by the commissioners of Mercer county was strictly in the performance of their official duty under the Act of Assembly of the 4th May, 1852, the subscription having been recommended and directed by a grand jury, designating the amount as fully as was required of them by the said act.

The answer concluded in the usual manner, and prayed to be hence dismissed, with the costs and charges in that behalf expended.

The Act of the 4th of May, 1852, authorizing the subscriptions by the county of Beaver, Lawrence, Mercer, Crawford, and Erie, or either of them, contained the following:—

"Provided, That the subscriptions to be made by all or either of the counties of Beaver, Lawrence, Mercer, Crawford, and Erie, shall be made subject to the following restrictions, limitations, and conditions, and in no other manner or way whatever, viz.: all such subscriptions shall be made by the county commissioners of the county subscribing, and shall be made by them after and not before the amount of such subscription shall have been designated, advised, and recommended by a grand jury of said county or counties; and the amount of such subscription shall not, in any case, exceed six per cent. on the assessed valuation of said county or counties so subscribing; and the amount of such subscription ordered and designated as aforesaid, may be made payable, either in money or in the bonds duly executed and authenticated of the said county or counties so subscribing in sums of not less than one hundred dollars; and such bonds shall in no case, or under any pretence, be sold, assigned, or transferred by the said Pittsburgh and Erie Railroad Company, at less than the par value thereof; and the bonds so issued shall not be subject to taxation for any purposes, till after the clear annual profits of the said road shall amount to six per cent. on the cost thereof; *and provided further,* that the acceptance of this act by the company shall be deemed also an acceptance of the provisions of the act

[Mercer County *v.* Pittsburgh and Erie Railroad Company.]

passed the 11th day of March, 1851, entitled An Act fixing the gauges of railroads in the county of Erie."

The Act of 11th March, 1851, provided that the tracks of railroads running westwardly from the city of Erie to the Ohio state line, should be of the gauge of four feet ten inches, and those east and south, of the gauge of either six feet, or four feet eight and one-half inches.

On the 18th January, 1853, at a meeting of the stockholders of the company, it was resolved that it was inexpedient to accept at that time the subscriptions of the several counties, on account of the proviso which made the acceptance of the benefits of the Act of 4th May, 1852, an acceptance of the " Gauge Law." But that the ultimate acceptance or rejection of the subscriptions be postponed for further consideration at some subsequent meeting.

On the 11th April, 1853, the Act of 11th March, 1851, known as the " Gauge Law," was repealed. And, on the 25th of the same month, the board of directors, at a meeting held, caused notice to be given to the counties which had subscribed, that the subscriptions had been accepted by the company; and a committee of three members was appointed to secure the bonds of Mercer county at the earliest possible day.

The bonds were accordingly issued and delivered, as stated in the bill of complaint.

The evidence returned, together with the answers of the respondents showed, that on the 19th November, 1849, Charles M. Reed, and nineteen others, subscribed to the capital stock of the company 15,110 shares of $50 each, amounting to $755,500, of which Reed subscribed 14,500. On this stock 5 per cent. was required to be paid, in order to lift the charter. Charles M. Reed was constituted receiving commissioner, and upon his receipt and certificate of the payment of the same, the charter was obtained.

On the 14th August, 1851, Reed and the other original subscribers were authorized by the board of directors to transfer the stock held by them respectively to David McAllister, the secretary of the Company, and they to be released from further liability on it.

On the 24th December, 1851, this same stock was reassigned to the same parties who had previously held it, and on the same day they transferred it to J. B. Curtis and others. Reed and his co-subscribers were thereupon released from all further calls or liability on the stock. The board of directors also authorized the treasurer to receive the notes of the parties to whom the stock was transferred, amounting in the aggregate to the sum of $37,775, being the amount in the hands of Reed as receipting commissioner for the 5 per cent. paid on the original subscription, and a receipt for the amount was given to Reed.

The larger part of this stock was afterwards transferred, by the

[Mercer County *v.* Pittsburgh and Erie Railroad Company.]

persons holding it, to trustees, who were to hold it and transfer it to such persons as should be designated by the board of directors, or to such parties as should subscribe to the stock.

On the 25th August, 1853, the company entered into a contract with S. P. Johnston & Co. for the construction of that part of their road lying in Mercer county, at stipulated prices for the various kinds of work. The estimated amount of the work was $400,000. This work was, by the terms of the contract, to be paid for in the bonds of Mercer county and the stock of the company at their par value. On this contract there had been paid to the contractors $65,100 in Mercer county bonds and a proportionate amount of stock, and $84,900 of the bonds remained in the hands of the treasurer of the company.

The evidence taken and returned by the commissioner was very voluminous, but a further statement of it is not deemed material to the understanding of the points decided by this court.

The plaintiffs contended that the bonds of the county were issued and delivered without any authority:—

1. Because no subscription was made by the board of commissioners of the county of Mercer, acting as such, in any book of the company, or by any resolution entered upon the minutes of the county commissioners.

2. That no amount of subscription was designated, advised, and ordered by a grand jury of Mercer county, but only an indirect recommendation of such an amount as the commissioners should see proper, not exceeding $150,000; which was not a compliance with the Act of 4th May, 1852.

3. That the provision in the act, preventing a sale or disposition of the bonds at less than their par value, had been evaded by the company, by paying a higher rate for work to the contractors, who took the bonds in payment for the same.

4. That no subscription by the county could be legally made until after the acceptance of the Act of 4th May, 1852, by the railroad company, and which their proceedings show were rejected after the alleged subscription was made.

5. Because the bonds were not issued in payment of any subscription made by the county, but as an absorption, *pro tanto*, of the original stock subscribed by individuals, which is contrary to the letter and spirit of the Act of 4th May, 1852; and that the transfer and suppression of the original subscriptions was a fraud on the county.

The defendants on their part maintained that the subscription was made in substantial conformity with the Act of 4th May, 1852, and was valid and binding on the county; and that nothing had been shown on the part of the complainants to invalidate the subscription or bonds in the hands of the company.

[Mercer County v. Pittsburgh and Erie Railroad Company.]

*Stephenson*, for complainants.—1. There is no subscription to the stock of the company, either on its books or on the record of the commissioners' office. No resolution to subscribe is made by a board of county commissioners legally constituted. The Act of 15th April, 1834, §§ 19 and 20, defines the manner in which the duties of the commissioners are to be performed. They are to keep a record of their proceedings; and copies of these are made evidence of their official acts, and we think the only evidence that can be given of them. In the case of the Commissioners of Allegheny v. Lecky, 6 *S. & R.* 170, it is held when the legislature gives certain powers to the county commissioners by the general official designation as commissioners, it must be supposed that those powers are to be exercised by the board.

The same doctrine is maintained in Cooper & Grove v. Lampeter Township, 8 *W.* 127, and counties are regarded as bodies corporate of a public nature, their powers to be exercised by the commissioners who are constituted their organs or agents. Like natural persons, they would only be bound by the acts of their agents within the scope of their authority.

In the case of Lehigh County v. Kleckner, Justice ROGERS says: "It must be remembered the commissioners are public agents, with authority well defined, and the extent of it well known." And the execution of those powers should, to protect the public, be confined strictly within the limitations, restrictions, conditions, and modes prescribed.

Applying these rules to the case in hand, we find no execution of the power to subscribe, by *the board* of commissioners acting as such.

But if there even had been an offer to subscribe, that was rejected by the company, on the 18th January, 1853. It is not pretended there was any made after that. By the rejection of it, by the company, even if it would have been good as a subscription, it became void, and to make it binding on the county there must have been a new subscription made. The act of the board of directors in accepting that which had become defunct by their previous rejection, could not revive it as against the county.

2. But if a subscription was made by the commissioners, it was void for want of authority. The language of the act is peremptory and direct: "All such subscriptions shall be made after and not before the *amount* shall have been *designated, advised, and recommended* by a grand jury of the county." This direction admits of no evasion; the designation of the amount was exclusively intrusted to the grand jury; had they designated the amount, and advised a subscription of it, the commissioners could not have changed it or bound the county for a different amount. It was still discretionary with them as a board, whether they would make the subscription even after the grand jury had designated, advised,

[Mercer County *v.* Pittsburgh and Erie Railroad Company.]

and recommended its amount; but they were prohibited from acting till after the grand jury had exercised the authority committed to them; and that was not merely to fix a limit, beyond which the commissioners should not go—the legislature had already done that themselves—but to designate the sum to be subscribed. The grand jury failing to act as required by the statute, the subscription must fail. No authority was conferred elsewhere to supply the omission. Neither did the commissioners, as a board, designate the amount to be subscribed, or authorize the subscription of any designated amount; no record of any such action exists. If any amount was subscribed, it must have been designated by the railroad company, or by the commissioner or commissioners making the subscription; but whether acting in or out of the board, officially or unofficially, does not appear; but by whomsoever the amount to be subscribed was designated, it is certain it was not done by the authority created by the legislature for that purpose.

3. Another condition or restriction to which the subscription was to be made subject, was that it might be made payable in money, or *bonds* of the county, which could not be disposed of for less than their *par value.* It was contended, also, that this latter provision had been evaded by allowing the contractors exorbitant rates for the work, in consequence of taking the bonds in payment.

4. No subscription could be legally made by the county until after an acceptance by the company of the supplement of 4th May, 1852, authorizing it to be made. That was rejected as late as 18th January, 1853, and the bonds are claimed to have been issued in pursuance of a resolution of the county commissioners, 23d June, 1852. These acts were void, because the law authorizing them, being a supplement to defendant's charter, had not been accepted. It imposed burdens, as well as conferred benefits, and the one could not be enjoyed without submitting to the other. How could it be held that the county was liable, while the company claimed and enjoyed immunity from the disabilities of the act? It was not binding till accepted, and not being binding on the company, all acts done under it were void.

5. It was argued that the transfer of the stock to trustees, and the release from all liability of the original stockholders, was a fraud upon the county. That this exhibition of stock, supposed to be real and *bona fide,* was held out as an inducement to the county and her officers to subscribe. It was not a transfer of stock already taken and subscribed that the county was entitled to. She was not authorized to purchase stock, but to subscribe to the original capital stock. It was also a fraud, because it placed the money, or bonds of the county, under the control of a board of thirteen directors elected upon a stock of $37,755, which had all been absorbed in salaries and expenses, while the county, with $300,000 actually subscribed and paid in, had but three directors. The

[Mercer County *v.* Pittsburgh and Erie Railroad Company.]

release of the subscribers to the original stock was also a fraud upon the county, by leaving her alone to bear the hazards of the enterprise.

*A. W. Loomis,* for respondents.—Conceding the truth of the allegations in the bill, the remedies sought cannot be attained in this proceeding.

The company was duly organized, and its act of incorporation and letters patent are full evidence that the prerequisites were complied with: *Pamph. L.* 1850, p. 812; Act 4th May, 1852: *Pamph. L. p.* 605; 7 *Wheat.* 522; 6 *J. R.* 558; 7 *How.* 159; 1 *Cow.* 734; 9 *Pet.* 503; 10 *Id.* 209; 7 *Id.* 274; 13 *How.* 361; *Sto. Eq. Pl.* § 257.

The subscription was made, in pursuance of the recommendation of the grand jury of Mercer county, not to exceed $150,000. It could not be for more—it might be for less. This is a substantial compliance with the act. The commissioners did not exceed the amount fixed as the limit. It was at most a mere irregularity, and was waived and cured by the execution and delivery of the bonds. The act authorized the constituted authorities of the county of Mercer subscribing to issue bonds in payment of the whole or any portion of the subscription, and the company were to receive these as cash. This was done, and when delivered the bonds became the property of the company—the county entitled to the stock. They were only subject to the control of the company. The county had no right to direct their use, only as a stockholder, and in common with the others. The county has shown no such right or interest in the bonds as justifies the interposition of a court of equity. If the subscription and bonds are void, the complainant has an adequate remedy at law.

The allegation in the bill in reference to the several transfers of stock, discloses nothing illegal or prejudicial to the interests of the county. It was done to promote the interests of the company and secure the completion of the road. It is not charged that the commissioners were ignorant of this matter, or that they would not have subscribed if they had possessed full knowledge of it. Neither the subscription nor the delivery of the bonds is alleged or proved to have been procured by fraud or falsehood. The allegation is only one of surmise and apprehension, which is insufficient to found a decree upon divesting the title of the company to such a large amount of property.

The next allegation is that the complainants have been *informed and believe* that the company were using the bonds for other purposes than the construction of the road, and had disposed of a large amount at less than their par value. Were this allegation, so vaguely made, even true, the bonds could not be declared null and void without making the holders of them parties, and would

[Mercer County *v.* Pittsburgh and Erie Railroad Company.]

not justify an injunction against using the residue at all, because a part had been used improperly. The true remedy would be, to restrain the company from making an illegal use of them.

It was further contended that the allegations of the bill were not supported by the proofs, and that the answer meets all the material charges, and is fully sustained by the testimony returned.

The complainants are barred of all equitable claim to relief by *laches* and acquiescence. Conscience, good faith, and diligence are necessary to call a court of equity into action: *Bright. Eq.* § 306. The subscription was made in June, 1852, the bonds issued in October, 1853, and directors then appointed by the county. They had access to the books of the company, and all the means of knowing fully its affairs, had a voice in its deliberations, and votes in its determinations. It is to be presumed that their agents discharged their duty faithfully. And now, after the lapse of years, after participating in the measures of the company, and after it has, without objection or remonstrance, pledged the whole amount of the bonds to the construction of the road, and thereby secured the sale of a large amount of stock; after the payment of the interest on the bonds sold by the company; the county seeks to repudiate its contract and annul its obligations. Will such relief be granted at this late day, when it will work irreparable injury to the company and suspend its operations, and thereby throw upon the county of Mercer the payment of the interest upon the bonds sold, and their ultimate payment, without any corresponding benefit?

The interests of the complainants, as well as respondents, require that the prayer of the bill should be refused.

The opinion of the court was delivered by

LEWIS, C. J.—This bill prays for an injunction to restrain the railroad company from paying out any of the bonds which have been issued by the county in payment of a subscription to the stock of the company. The Act of Assembly of 4th May, 1852, authorizing the constituted authorities of the county to subscribe to the stock, declares that the subscription to be made "*shall* be made subject to the following *restrictions, limitations,* and *conditions,* and *in no other manner or way whatever,* viz., all such subscriptions *shall* be made by the county commissioners of the county subscribing, and *shall* be made by them, *after* and not *before,* the amount of such subscription shall have been *designated, advised,* and *recommended* by a grand jury," and "the amount of such subscription *ordered* and *designated* as aforesaid may be made payable either in money or in the bonds" of the county so subscribing. At the May Sessions of the Court of Quarter Sessions of Mercer county, 1852, the grand jury signed a paper in which they state that they "would recommend the commissioners of Mercer county to subscribe to the capital stock" of the company

[Mercer County v. Pittsburgh and Erie Railroad Company.]

" to such amount and under such restrictions as may be required by the Act of Assembly authorizing them to subscribe stock to said road, to an amount not exceeding 150,000 dollars." Under this authority two of the commissioners subscribed to the stock of the road to the amount of $150,000, and bonds have been issued and delivered to the railroad company, in payment of the subscription. $65,100 of these bonds have been paid to S. P. Johnson & Company, on account of work under their contract. The residue of the bonds, to the amount of $84,900, remain in possession of the railroad company.

It is impossible to read the Act of 4th May, 1852, without perceiving that *all discretionary power* touching the subscription to the stock was given exclusively to the grand jury. They were directed to "*designate* the amount of the subscription to be made, and when they did so designate the amount, and "advise and recommend" the subscription, it was imperative upon the commissioners to obey. The language of the act is that the subscription "shall be made" by the county commissioners. The mandate is repeated in the clause declaring that the subscription *shall* be made *after* "the grand jury have *designated,* advised, and recommended" the amount. It is indicated in the express prohibition of any subscription *before* the amount is so designated by the grand jury. It is plainly proclaimed in the preliminary clause declaring that the subscription shall be made subject to the "restrictions, limitations, and conditions" specified in the act, "and in no other manner or way whatever." That the action of the grand jury was intended to be mandatory—a command and not merely an authority—is manifest from what has already been said. The "advice and recommendation" of the grand jury was to be regarded as an *order,* which the commissioners were not at liberty to disobey. This is the plain meaning of the act. It breathes through every word, and speaks out in every line. As if to leave not a particle of doubt on this question, the legislature, in a subsequent part of the act, speak of the amount of such subscription as " *ordered* and designated as aforesaid." It follows that the commissioners had no discretionary authority whatever in the matter; they were merely permitted to hold the pen, and to write precisely what they were directed by the grand jury to write. Nothing more—nothing less. We can readily see many good reasons for this. The commissioners are selected so long in advance of the decision to be made, that all persons who may be disposed to apply improper influences have abundant opportunities of doing so. They are but three in number, and two of these might decide the fate of the county. These two might lack the wisdom necessary for such an important measure. They might also lack the integrity required for such a high trust. It is not necessary to deal in ambiguous language when discussing such a subject. From the beginning of

the world to the present time, history has been teaching her lessons of human frailty, beguiled and corrupted by human wickedness. It is fair to presume that these lessons were not lost on the legislature. Although they could not distinctly see the wily serpent of corruption, the waving of the grass often indicated his stealthy course. It is therefore not improbable that one of the objects of the restrictions in the Act of 1852 was to guard against bribery. Whatever may have been the motive, the legislature were unwilling to place the fortunes of a whole county at the disposal of two county commissioners. I do not regard the declarations of Pennock, one of the county commissioners who issued these bonds, as legal evidence to convict the railroad company of bribery. But his declaration, after the subscription had been made, and after the work had been allotted to the contractors, that he "had not got work—that he had not yet signed the county bonds, and would not unless he got work on the road," and the two events which followed this unblushing admission, viz.: his signing the bonds and getting work on the road, are certainly high evidence of his unfitness for the trust, and of the wisdom of the legislature in refusing to trust him with any discretion whatever on the subject. The grand jury are not so readily influenced by improper suggestions. They are selected for their judgment and integrity, and come from all parts of the county, without respect to party politics. They are exposed to temptation for too brief a period to be safely approached—they are too numerous to be easily led away from their duty by "work" on a railroad, or by any other improper considerations. In the multitude of their counsel there is comparative safety. They are the usual agents of the county, when the question of erecting county buildings or county bridges is to be decided. These are some of the reasons which may have influenced the legislature in insisting that the amount of the subscription in this case should be "designated" by the grand jury. But it is sufficient for the court to know that the law is so written and must be obeyed. It is a special authority, and must be strictly pursued. There is not a word in it which authorizes the grand jury to transfer from their own shoulders any part of the responsibility which the legislature placed there. An attorney without power of substitution cannot appoint an attorney in his place. Discretionary powers given to trustees will not pass to heirs, nor personal representatives, nor assignees, nor devisees, nor survivors: *Hill on Trustees* 488; 16 *Ves.* 44; 16 *Ves.* 45; 1 *B. & Ald.* 608; 2 *Ves.* 643; 2 *Sim.* 264; 2 *Hare* 200; 16 *Ves.* 22; 13 *Sim.* 91. They will not pass even to a new trustee appointed by a court of equity: *Amb.* 309. When the grand jury authorized the commissioners to subscribe any "amount not exceeding $150,000," they failed to execute the power conferred upon them. Such a proceeding was no designation of the amount—it was a plain transfer of that duty to the

commissioners, giving them the discretion to subscribe $50 or $150,000, or any intermediate sum. This was precisely what was prohibited by the statute. As the legislature neither intrusted the commissioners with any such authority, nor authorized the grand jury to trust them with it, the conclusion follows that the subscription to the stock of the Pittsburgh and Erie Railroad Company has not been made by competent authority.

There is another objection equally fatal to the subscription by the commissioners. The law in existence at the time a contract is made, enters into and necessarily forms a part of it. In like manner, the law in force, when a proposal for a contract is made, always forms a part of it, and is the essential and true exponent of the intention of the party in making it. If the proposal be not accepted until the law under which it is made undergoes such a change that a subsequent acceptance would constitute a contract materially different from that intended when the proposal was made, it is manifest that the acceptance comes too late to bind the party. In such a case, the proposal falls with the repeal of the law which induced it. No contract can be made on the basis of it. The negotiations must commence *de novo*. The Act of 4th May, 1852, authorizing the county of Mercer to subscribe to the stock of the company, contained a *proviso*, which declared that the acceptance of that act by the company shall be deemed also an acceptance of the provisions of the Act of 11th March, 1851, entitled "An Act fixing the gauges of railroads in Erie county." When the grand jury recommended the commissioners to subscribe, it was expressly required by them that the subscriptions should be made "under such restrictions as may be required by the act of Assembly authorizing them to subscribe stock to said road." So that the grand jury, not tacitly but expressly, required that the subscription should be made under the restriction that the Act of 11th March, 1851, fixing the gauges of railroads in Erie county, should be accepted by the Pittsburgh and Erie Railroad Company. This recommendation was made in May, 1852. Were the terms accepted by the railroad company? Far from it. On the 18th January, 1853, the stockholders of the corporation, at a meeting called to take action relative to the county subscriptions and the gauge law, unanimously repudiated the provision in the Act of 4th May, 1852, relative to the gauge law, and determined that "it was inexpedient" at that time "to accept the county subscriptions under this provision of said recited act." The question of ultimate unconditional acceptance or rejection of the subscription was postponed for further consideration at some subsequent meeting. On the 11th April, 1853, the Act of 11th March, 1851— called the Gauge Law—was repealed. On the 26th April, 1853, being fifteen days after the repeal, the railroad company passed a resolution, directing notice to be given to the commissioners that

[Mercer County *v.* Pittsburgh and Erie Railroad Company.]

their subscription had been accepted. On the 5th July, 1853, Messrs. Waugh, Goodwin, and Hubbard were appointed a committee "to secure the bonds of Mercer county at the *earliest possible day.*" They were accordingly secured before Mr. Pennock went out of office. If this constitutes a valid contract, the county is bound up to terms entirely different from those expressed and intended by her constituted authorities. If the transaction were between individuals, the subsequent assent to the acceptance, and the delivery of bonds in pursuance of it, would, of course, constitute a valid contract. But in this case, the grand jury alone possessed the power to bind the county; they made the original proposal, and they alone had authority to vary its terms and enter into a new contract binding on the county. It is not pretended that they have, directly or indirectly, done any act whatever tending to sanction or ratify the illegal proceedings of the commissioners and the railroad company. As the commissioners had no original authority to make the subscription, it is scarcely necessary to say that they possessed no power, by any subsequent action, to ratify their own unauthorized proceedings.

It is true that where an agent transcends his authority, it is the duty of the principal to disavow it as soon as it comes to his knowledge; otherwise he may be precluded from making objections afterwards, to the injury of persons who may have innocently invested their money on the faith of the acts of such agent. Where a class of persons, such as the citizens of a county, are interested, they cannot be expected to bring actions at law in the name of the county so long as the munipical rights are under the control of faithless agents, or until they have had an opportunity to remove them. But as every taxable inhabitant is interested in all measures which increase the taxes, he may apply for an injunction against abuses of that character. The taxable inhabitants of a county, although entitled to great indulgence on account of the limited interest which each one has in the question, may, nevertheless, be affected by delay and acquiescence. How far this principle may protect innocent holders of the county bonds already negotiated, will be a matter for consideration when the proper parties are before us. But, in regard to the bonds still in possession of the railroad company, the delay in making this application has worked no injury which the company have a right to complain of. They knew, or, what is the same thing, they were bound to know, that the subscription was not made by competent authority; and they also knew that the offer of the grand jury had not been accepted with any intention to comply with the terms upon which it was made. They are parties to the wrong, and have no right to profit by it. The allegation that the bonds have been pledged for work done, or to be done, on the railroad, is not sustained. It is not necessary to enter into the merits of

[Mercer County *v.* Pittsburgh and Erie Railroad Company.]

the contract with what is called the firm of "S. P. Johnson & Co." Messrs. Waugh, Goodwin, and Gibson, were partners in that firm, and directors in the railroad company when the contract was made. Two of them were on the committee appointed to "*secure*" the bonds from the county, "at the earliest possible day." That firm had, therefore, full notice of the manner in which the bonds were obtained. The contract to receive payment in county bonds, is neither an assignment nor a pledge of the bonds. They are still under the control of the corporation. The injunction may, therefore, operate on them without inconvenience to any one except the parties to the wrong.

For these reasons I am in favour of declaring that the bonds signed by two of the commissioners of the county of Mercer on the 8th October, 1853, still remaining in the possession of the Pittsburgh and Erie Railroad Company, amounting to the sum of $84,900, are null and void, and not binding on the said county of Mercer. I am also in favour of granting an injunction against issuing and paying out any of the said bonds; and directing that the same be delivered up and cancelled.

Mr. Justice WOODWARD concurs in the foregoing views, and Mr. Justice LOWRIE unites in what is said in regard to the effect of the refusal to accept the offer to subscribe upon the terms under which it was made.

Injunction granted.

Concurring opinion by

LOWRIE, J.—When the law of 4th May, 1852, was passed, authorizing subscriptions by Mercer and other counties for shares in the capital stock of this railroad company, the legislature must be presumed to have known the legal character of the company, and to have acted with reference to it, for nothing in the act authorizes any other supposition.

It was a company chartered in 1846, in pursuance of a law that required that it should have a capital of not less than $750,000, and not more than $3,750,000, actually subscribed in shares of $50 each, and five per cent. of the amount subscribed actually paid in, before it should be entitled to its charter. It was therefore in a company appearing to have already individual stockholders who had subscribed stock to an amount not less than $750,000, that the legislature authorized Mercer and other counties to subscribe for shares of stock.

It is charged in this bill of complaint that, at the time the subscription was made by Mercer county, which is now sought to be avoided, the said company had in fact no stock at all subscribed, but that all that had been subscribed in order to obtain the charter had, by a secret agreement among the stockholders, and in fraud of the county, been suppressed, and that no assessments or calls had ever been made upon it.

If this charge contains any substantial truth, then of course there was such a change in the essential character of the company; it became, by that act, so entirely different from what it was required to be by its charter, and what the legislature must have presumed it to be, that it would not be entitled to the subscriptions which it might obtain under the powers intended to be granted by the law of 1852.

This, therefore, is an essential point of this case, and we proceed to examine it. The charge is not really denied in the answer, and we are referred to the records of the company for the facts, and as they furnish us with all that is needed, we shall confine ourselves to them.

When the charter was issued by the governor, there had been subscribed to the stock of the company the sum of $755,500, and the sum of $37,775 was actually paid in. On the 11th February, 1850, they elected directors, and the board met and organized. For a year and a half afterwards they seem to have been making efforts to have the road located and the work on it commenced, but were unsuccessful. The reason of this appears in the minutes of 14th August, 1851, which show that the directors, who held all the stock but a very few shares, were unwilling to be called upon for their subscriptions, and determined not to let the work unless the contractors would receive payment for it by a transfer of the stock held by them. They then resolved that the stock of the original subscribers should be used in paying the contractors; and to protect the said subscribers from liability for their subscriptions until the same should be paid out and absorbed by the contractors, they further resolved that the original subscribers might transfer their stock to the secretary of the company, and that on doing so they should be released from all further liability for the same, and it should be held by the secretary in trust for the company. Some of the stock seems to have been assigned in pursuance of this resolution, for on the 24th December following it was directed to be reassigned, preparatory to the following very important proceedings.

On that day a total change was effected in the character and organization of the company. Thirteen new members were admitted, by having twenty shares of the original stock transferred to each of them. Then, all the stock subscribed was transferred to them, and the original subscribers were released from all liability on account of the same. Then the $37,775, said to have been paid in before getting the charter, and which was considered in the hands of C. M. Reed, was settled, by releasing him from the same, and by authorizing the treasurer to receive from the thirteen new members their several equal notes, amounting in the aggregate to that sum (whether they were ever given or paid we know not), and thereupon they were elected directors of the company. In

other words all the old stockholders cancelled their subscriptions, and withdrew, taking all the funds with them, and allowed thirteen strangers to step in and take up the abandoned charter, divide the now nominal stock among themselves in about equal proportions, and without the payment of a dollar of stock, or subscribing to pay any, call themselves the Pittsburgh and Erie Railroad Company.

This was their condition when they directed their president to take the measures that resulted in obtaining the law of 4th May, 1852, for authorizing the subscriptions by the counties. Is it possible to suppose that the legislature intended to authorize the counties to subscribe stock to such a corporation? Is it possible to suppose that the grand jury which sanctioned such a subscription, and the commissioners who made it, intended to involve the interest of the public in a company so unreal? No, it is not.

It might not be unreasonable to suppose that the county might safely subscribe $150,000 of its credit to a company which, according to law, appeared to have already obtained private subscriptions to more than five times that amount; for it might be presumed that, where so large a private interest was involved with that of the public in the same enterprise, there was a sufficient guaranty for the careful management of the whole. That the legislature should intend to authorize county subscriptions to be made to a company that had no real capital; that they should place the people's money under the control of thirteen self-constituted directors, having no real interest in the intended object and representing none, and give the county investing $150,000 of capital, the nominal and futile influence of three directors, so that the whole control of the county funds should belong to those who had nothing to lose by bad management, is an idea too absurd to be admitted for a moment.

The subscription by two of the county commissioners of $150,000, is said to have been made in June, 1852; but it had a condition in relation to the interest that caused a delay in accepting it, and it was not accepted until 25th April, 1853, and the bonds were not delivered until September, 1853, when the directors on the part of the county were admitted to seats in the board. And here again appears the truly nominal character of the stock professed to be held by the thirteen directors. It was entirely under the control of the company, that is, nobody owned or had paid anything on it, and 3000 shares of it were transferred to the county. The county subscription was not treated as a real subscription, but as a means of taking up the old abandoned stock, and that was not at all the character of county subscription intended by the law.

That this company had no real capital appears from other subsequent parts of the minutes. On 5th July, 1853, they authorized

some explorations, and directed the expenses to be paid by private advancements, which should be credited in stock subscribed or to be subscribed by persons making such advancements. On 2d August, 1853, they authorized the persons in whose names the stock stood on the books to transfer it to such persons as they should designate, to hold in trust for the company, and the persons to whom it should thus be assigned were to be entitled to vote upon it. In this connexion it is proper to notice that on the previous 18th January there appear to have been 12,366 shares represented and voting at a stockholders' meeting, which would be equal to a capital stock of $618,300. It is used as private stock when votes are wanted, and it belongs to the company when money is wanted.

Now it is absurd to say that the company may really be a stockholder in itself or own its own stock. If nobody else owns it, it is simply stock not taken. If we say that all shares are held by the corporation, or in trust for the corporation, then we say that there is no stock taken, there are no stockholders, no directors, and no company. And, so far as we can discover from the minutes, there was none at the time of the acceptance of the subscription of Mercer county.

On 25th August, 1853, we find the first call made upon subscribers of stock to pay an instalment, and that is confined to subscribers for the branch road in Crawford and Warren counties, and to $50,000 of stock guarantied in some way by three persons named. In no part of the minutes do we discover that any instalments have ever been called in on the original stock, all of which was transferred to the directors. It was this stock that was used to be issued to contractors for their work, to counties for their subscriptions, and to landowners for the right of way. Of course that which was thus issued was paid up in full, and if the remainder belonged to the company it was not stock at all, and therefore not subject to calls, and the holders of it were not stockholders, and therefore could not be directors. Even as late as June 13, 1855, this original stock seems to have remained in this condition, except so far as it had been transferred to the counties, contractors, &c., for then it appears that it was still in the hands of trustees for the company, and it was ordered that it should be assigned to and for the use of the company within thirty days, and " that all stock heretofore issued shall be considered as of the said fund."

Such is the character of this company, as exhibited by its own records, and we are constrained to say that it was not in favour of such a company that the legislature passed the Act of 4th May, 1852, authorizing county subscriptions. They were not in such a condition as entitled them to ask or accept such subscriptions, and

[Mercer County *v.* Pittsburgh and Erie Railroad Company.]

they cannot enforce the payment of them, or make any use of the bonds of the county which were issued to provide for payment.

But it is argued that, because the county commissioners appointed directors in 1853, and also in 1855, who acted as such without raising any objection to the organization of the company, and because the county made no objection for more than two years after the delivery of the bonds, and because the work is one of great public importance, and the directors have been conducting it faithfully and energetically, and have made many contracts on faith in their right to the bonds, therefore equity will now hear no complaints on the subject.

Let us examine this argument. It is plain enough that, where the property of others has been wrongfully obtained, it is not an equitable answer to the claim for restitution, that the holders of it are doing what they can to make a good use of it. It is just as plain, that where one starts in business, and runs in debt on capital thus acquired, this does not bar the right of action of those from whom it was obtained. When persons become creditors of another on their faith in such illusive appearances of wealth, they acquire no claim against the wealth itself; for their trust is not in it, but in him, for the truth of his claim or title to it.

What is the effect of the delay of the plaintiff, for two years and nearly eight months after the directors were appointed by the county commissioners, before bringing this suit? In our opinion, it has no effect at all on the right of the plaintiff. Let us bear in mind that the real plaintiffs are the people of Mercer county, and not their commissioners, nor their directors. The people had no legal capacity to enter into a contract of this sort, except in the very form and spirit of the power given by the Act of Assembly; and we have already shown that they have not thus contracted, and that the defendants are in no position to insist on the contract pretended to have been made. Neither the people nor the commissioners of Mercer county ever had any capacity to make such a contract.

Then how can the pretended one be confirmed? A confirmation is itself equivalent to a contract, and is treated as one. It is an implied contract not to avoid a contract that is voidable: therefore, he who has no capacity to contract, can have no capacity to confirm, else all incapacity to contract would be set aside by a capacity to confirm. Then how is it possible that the negligence of the commissioners, or the fact of their being represented in the direction of the company, can have the effect of confirmation? To give it this effect, would be merely implying a contract of confirmation, when it is perfectly apparent that the most express one that they could make would be utterly void.

The supposition that the people of Mercer county are to be estopped, for the delay existing here, from asserting their rights,

[Mercer County *v.* Pittsburgh and Erie Railroad Company.]

really needs no answer, except that they could not possibly know the manner in which their rights had been disregarded, and they had no means of asserting them, until, in the due course of elections, they should get clear of the commissioners who had so indiscreetly managed their concerns. And the argument that, because the county was represented in the board and her directors delayed to raise objections, therefore the contract is confirmed, is an attribution to the directors of a power to contract, which the people themselves could not give. And this argument is founded on the gratuitous assumption that the directors must have understood the character of the company's proceedings and the rights of the county in relation to them; which is attributing to the inexperienced directors on the part of the county a better understanding of the affairs of the company, and of the rights growing out of the charter, than any of the thirteen old directors appear to have had, or than anybody else had, before the bringing of this suit. Besides, it was the business of the directors only to see that the affairs of the company were well managed during their time, and not at all to investigate and report upon the question of the right or propriety of the county subscription, for the law had intrusted this duty to others.

The old directors seem to have thought that they might lawfully constitute themselves into a corporation under this charter, by dividing among them the name of shareholders, or the right to become subscribers, for 15,000 shares; and that, without any one of them intending to be a real subscriber for the stock standing in his name, or having paid anything on it, or intending to pay it up, each of them might vote at elections and become directors, and call themselves a railroad company, and to get real subscriptions from others, to be under their management, and to call in all the shares subscribed by others, and no part of that held in their own name; and how can they say that the plaintiffs' directors ought to have known and taught them better? If they could do this ignorantly, they cannot wonder that others should witness it silently. If they did it fraudulently, they have no foundation for their expectation of equitable indulgence.

If the right acquired by the defendants, from the acquiescence of the plaintiff's agents, is to be measured by the knowledge which those agents had of the business they were attending to, then it is little indeed; for it is impossible to discover that they had any intelligent comprehension of the relations of the old directors to the company, or of the rights of the county as a subscriber to its stock. That the commissioners should subscribe and issue negotiable bonds for $150,000 of stock without seeing that there was a real company, with real stockholders to the amount required by law, and real directors, and without seeing that others, at least

[Mercer County *v.* Pittsburgh and Erie Railroad Company.]

the directors, had paid up their stock, is a most emphatic proof that no intelligent acquiescence is to be charged to them.

If the legislature had really intended to say that the county funds might be invested in such a corporation as this, then the objection of want of capacity to subscribe would be removed, and we should have to consider the difference between the nominal and the real condition of the company in its relation to the intention of the county officers who participated in the subscription. The law of the charter was to them sufficient evidence that the corporation ought to be possessed of a capital of at least $750,000; and it must be presumed that it was their faith in this state of things that induced them to make their subscription. If this appearance was substantially false, then of course the company can have no equitable claim to insist on the subscription or on the bonds given on it, unless they show that, before the subscription was made, they honestly and fully explained to the grand jury and commissioners the real condition of their affairs; and it is not pretended that they did so.

Looking at the transaction in this aspect, the subscription would be avoided, not for the legal incapacity of the county to make the contract, but for the imposition of the false appearances which led to it. In such a case, the contract would be susceptible of confirmation; but even then only by acts done by those who had power to make the contract, showing an intention to confirm it with all its original defects, and being fully informed of them. We need not repeat what we have already said for the purpose of showing that there has been no such confirmation, especially as it is clear that, under the circumstances of this company, the county had no legal capacity to subscribe.

Several other arguments have been presented by the plaintiff's counsel, but it does not seem necessary to dwell upon more than two of them. One of them is, that the county subscription, being accompanied by several conditions, and one of them the gauge law of 1851, could be regarded only as a proposal, to be accepted in terms or not at all. The company rejected the gauge law, and did not accept the subscription until they had got that law repealed. This was not an acceptance of the proposal as it was approved by the grand jury, and no bonds ought to have been issued on it. Our views on this point have been sufficiently expressed by the Chief Justice.

The other objection is founded on the allegation that the bonds, already transferred by the company, have been transferred at less than their par value, contrary to the express terms of the Act of Assembly, and, we may add, contrary to the true spirit of such transactions. It seems to us that this charge is made out, by the proof that the contract with Johnston & Co. for some $400,000 of the work is made payable in these Mercer county bonds, $50,000

[Mercer County *v.* Pittsburgh and Erie Railroad Company.]

in cash, and the rest in the stock of the company, not appearing to have then had any market value. This seems like making use of the good securities of the county as a means of passing off the stock of the company; and there is satisfactory evidence that, by letting the work in this way, it cost 33 per cent. more than it would have done if the contractors were really to have been paid in par funds or Mercer county bonds. By this arrangement, $300,000 worth of work was let at the price of $400,000. In other words, the Mercer county bonds and the cash payments would have paid for two-thirds of this work included in the Johnston contract; but, because of the alloy of the stock, the price has to be increased $100,000; so that they pay but half of it. This mode of evading the law against disposing of the bonds below par cannot possibly be sanctioned; and we are of opinion that it justifies the plaintiff's demand for the restitution of the bonds that yet remain on hand.

We may view this part of the company's transactions in another aspect. It is called a sale of stock for work, but it is not, for the company cannot really own shares of itself. In reality it is allowing Johnston & Co. to subscribe for and take $200,000 of stock on paying for it $100,000, and this is making the shares of all the honest and genuine subscribers of the stock entirely deceptive. If the public subscriptions and the true private subscriptions should amount to $800,000, and should be disposed of this way, then the contractors by investing $400,000 in work would get $800,000 of stock, and thus have the entire control of the road, and be entitled to the half of the profits, and would secure all the employments to themselves. All this is totally inadmissible, and it demands a surrender of the county bonds until the county shall be restored to its rights.

In relation to the bonds which the company had passed away before this suit was brought, we have not such parties before us as to justify us in ordering their surrender, and we leave the plaintiff to such further and other remedy as justice allows and as counsel may advise. But the plaintiff is entitled to have restitution of all the bonds which were in the hands of the defendants at the time of the institution of this suit. In all the points here presented I express the views of my Brother WOODWARD as well as of myself.

KNOX, J., dissented, and BLACK, J., was absent at the argument.