**UNITED STATES of America ex rel. Frank Earl SENK**

v.

**J. R. BRIERLEY, Superintendent.**

**No. 1351.**

United States District Court,
M. D. Pennsylvania.

May 24, 1974.

John A. Mihalik, Bloomsburg, Pa., for petitioner.

Marc Kapustin, Deputy Atty. Gen., Harrisburg, Pa., for respondent.

## MEMORANDUM AND ORDER

NEALON, District Judge.

Petitioner Frank Earl Senk was convicted by a jury in Columbia County, Pennsylvania, of murder in the first degree on April 5, 1962. Since that time, petitioner has availed himself of both the appellate and collateral remedies afforded him in the state and federal judicial systems [1] in order to seek a reversal of his conviction on the grounds, inter alia, that his confession should not have been introduced into evidence since it was tainted by an illegal arrest, and/or, since it was involuntary.

A full evidentiary hearing was held before this Court on July 9 and 10, 1973, during which the burden was placed on

---

[1]. The legal history of this case is detailed in United States ex rel. Senk v. Brierley, 471 F.2d 657 (3d Cir. 1973).

respondent to prove by a preponderance of the evidence the validity of petitioner's arrest.[2] With respect to the voluntariness of his confession, petitioner elected to stand upon the evidence adduced at the murder trial.[3]

The facts, as adduced at the hearing before this Court and as I have found them to exist, are as follows:

Thirteen-year-old Jane Mary Benfield of 342 W. Park Street, Centralia, Columbia County, Pennsylvania, left her home about 9:30 A.M. on Tuesday, July 11, 1961, to deliver a jar of jelly to a neighbor some 2½ blocks away. Several minutes later she entered a Pontiac station wagon a short distance from her home, after being seen attempting to give directions to the driver. The automobile then proceeded north toward the nearby town of Aristes. About 7:00 P. M. on Wednesday, July 12, 1961, searchers discovered her denuded and sexually abused body in an abandoned, wooded mining area located approximately one-quarter of a mile east of the state highway leading to Aristes from Centralia. Her death, which was fixed at about 11:00 A.M. on July 11, 1961, was attributed to a fractured skull and/or strangulation.

After conducting a six-month search for the sex murderer, the Pennsylvania State Police (PSP) took Frank Earl Senk into custody at 9:15 P.M. on January 18, 1962. Shortly after 2:00 A.M. on January 21, 1962, Senk confessed that he killed Jane Benfield when she resisted his indecent advances. His statements relating the details of the crime were reduced to a writing which he signed.

During the course of their investigation, the PSP were aware of, or discovered, the following relevant information:

### THE TOWN

At the time of the murder, Centralia, as a result of recent mine closings, was a rather depressed area, having a population of about 1,000 persons, most of whom were either elderly or retired. Because of the scarcity of employment opportunities, young persons had to leave the area in search of work. The town enjoyed no tourist trade and visitors consisted mainly of relatives returning for the holidays. One-third of the resident families did not own or drive cars and the social life revolved around three churches. Townsmen usually dressed in a simple shirt and pants or overalls, a suit and tie being out of the ordinary. Two main roads passed through Centralia, viz; Route 42, running from south to north, and Route 61, a four-lane highway running north from Ashland, entering Centralia on its south edge and exiting at its west end.

### THE CAR AND THE DRIVER

During an interview conducted on July 12, 1961, the day the body was found, John May, Sr., 74, of 210 West Park Street, Centralia, told PSP that he saw Jane Benfield enter a blue and white station wagon sometime around 9:40 A.M. on Monday, July 10, 1961, after she apparently gave directions to the driver.[4] The driver, May said, had a full round face.

---

2. A preliminary ruling placing the burden of proof on respondent with respect to this issue was made by this Court prior to the hearing, and is reported in United States ex rel. Senk v. Brierley, 363 F.Supp. 51 (M.D.Pa.1973).

3. Cf. United States ex rel. Dickerson v. Rundle, 430 F.2d 462 (3d Cir. 1970), cert. denied, 408 U.S. 928, 92 S.Ct. 2498, 33 L.Ed.2d 332 (1972).

4. May said that he first saw the car traveling west on West Park Street, with the driver looking back and forth. The car drove slowly past Jane Benfield and then pulled into the intersection of West Park and Troutwine Streets, virtually blocking the road, May said. The driver then waited for some time until Jane Benfield reached the car. While addressing the driver, Jane Benfield made motions with her hands as if giving directions and then climbed into the car. May stated that the driver's face was turned away from him and that he could only tell that he had a full round face. Since none of the other witnesses described the shape of the driver's face, petitioner contends that the PSP were con-

Centralia Chief of Police William Johnson told PSP on July 13, 1961, that he saw Jane Benfield sitting next to the driver of a dark green or dark blue car on the day she was reported missing, but that he could not remember the exact time or direction in which the car was heading. The girl obscured his view of the driver.

During a July 13, 1961, interview with the PSP, Joseph Kowitskie of 310 Troutwine Street, Centralia, reported that he saw Jane Benfield riding in a blue Ford toward Aristes sometime between 9:30 and 10:00 A.M. on July 11, 1961. The driver, according to Kowitskie, was proceeding very slowly and it appeared that the car was going to stop at the post office. At that interview, Kowitskie said the driver was a white male, about 20 years old, with dark hair, woolly in the back, and wearing a dark blue suit. Later, in speaking with Trooper Lawrence O'Donnell on July 17, 1961, Kowitskie amplified his description, adding that the driver had short, dark brown hair, not a crew cut, was about 5'7", weighed 145 pounds, with smooth, tanned skin, good features, a clean, neat appearance, and was "Italian looking". He also told Trooper O'Donnell at that time that he was not sure of the make of the car, but felt that it was a medium blue station wagon.

Interviewed on July 13, 1961, Eleanor Stasulevich of 407 West Park Street, Centralia, described the driver of a blue car which she had seen pass by Jane Benfield's home several times every day around 10:00 A.M. for about a week and a half prior to the murder, as follows: a young man, about 19, weighing 145 pounds, with smooth, olive or light brown skin, dark hair, good looking, neat appearing, Italian looking. Alex Stasulevich, her husband, gave essentially the same description of the driver of a blue car which had almost struck his truck on the day of the murder.

From the descriptions given by Joseph Kowitski, Eleanor and Alex Stasulevich, Trooper Lawrence O'Donnell was able to sketch a composite (Composite R 9). (Hereinafter the designation "R" shall refer to Respondent's Federal Hearing Exhibits.)

A few days after the discovery of Jane Benfield's body, it came to the attention of the PSP that a similar attempt was made to pick up two young girls on 11th Street in Ashland, a borough about two and one-half to three miles south of Centralia, about 9:10 or 9:15 a. m. on July 11, 1961. Eva Ann Bagdonas, 13, and Linda Wertz, 13, the would-be victims, reported that the driver first asked for directions to Millersville and then to Ashland, and when they replied that they did not know, he offered them a ride. They described him as being in his late twenties or early thirties, with dark hair, blue eyes, dark complexion, medium build, and wearing a dark suit.[5] At a later interview with the PSP, held on August 4, 1961, the two girls established that the car which he drove was a 1959 Pontiac Safari station wagon, with a dark blue bottom and a light blue top, decorated with a rocket-shaped chrome strip on the side and the name Pontiac on the grill.[6]

strained to look for a man with a full round face. However, it is interesting to note that May was rather elderly and that he told PSP that the events he witnessed occurred on July 10, 1961, the day before Jane Benfield was reported missing. Given those circumstances, I do not believe that the PSP were compelled to hinge their search for the murderer on the single account given by this witness.

5. On January 24, 1962, Eva Bagdonas and Linda Wertz identified Senk at Columbia County Jail, Bloomsburg, from his appearance and voice. However, because the poor lighting in the jail prevented them from seeing the color of his eyes, they were not positive about his appearance. Subsequently, they did identify Senk positively when they saw him handcuffed in the sheriff's office in Bloomsburg.

6. PSP did not learn that Senk had borrowed a dark gray and white 1955 Pontiac station wagon for use on July 11, 1961, until January 21, 1962. They apparently traced the borrowed car from information supplied by Senk's wife, according to the trial testimony of Lt. Leon Salada, and learned that Mr. S.

Finally, on August 16, 1961, JoAnn O'Connor of 110 West Park Street, Centralia, told Trooper O'Donnell that at three different times on July 10, 1961, she noticed a faded blue Ford station wagon drive slowly past her house and head toward the home of Jane Benfield. She said the driver had black, naturally wavy hair, full lips, olive skin, and was Italian looking. Using her description and certain aspects of Composite R9, Trooper O'Donnell produced a second sketch, Composite R 11,[7] which described the driver as follows: "Age 18–22; white male; height 5'10"; 145 pounds, hair dark brown or black; curly hair pulled down over forehead; dark olive skin."

## THE LARCENY LINK

Senk escaped the active scrutiny[8] of the PSP until December, 1961, at which time an investigation into an unrelated larceny first cast suspicion in his direction. At that time, Trooper Samuel Yupco of the Milton Substation, was assigned to investigate the theft of a handbag from the home of Mrs. Altemus of Lewisburg, R.D. 1, Union County.[9] Yupco learned that the area was being canvassed by a group of magazine salesmen operating out of the Mifflinburg Hotel. Mrs. Solomon, a telephone solicitor for the Civic Reading Club of Har-risburg, told Yupco that Senk had been assigned to cover the Altemus home, but that someone had suspiciously erased his name from her log sheet. Senk was subsequently arrested on December 21, 1961, charged with larceny by the Mifflinburg Police and turned over to Trooper Donald Lindner of the Milton Substation. At that time Mifflinburg Police Chief Hall Solomon revealed to Trooper Yupco that he suspected Senk may have been connected with two other incidents involving young Irene Bilger who was followed and chased by an unidentified man in a car on December 5 and 15, 1961.

After his arrest on the larceny charge,[10] Senk was fingerprinted and it was revealed through a Bureau of Criminal Identification Report that he had been involved or implicated in a number of sex-oriented crimes,[11] including the sex slaying of a young girl in Beaver County and statutory rape in Florida.

Sometime between December 21, 1961, and January 1, 1962, Yupco, who had not seen Senk but wondered about a possible connection with the Benfield murder, showed Composite R 11 to Trooper Lindner who positively matched the sketch with Senk.[12] At that point, Yupco decided to report the results of his investigation to Lt. Leon Salada, then the

---

Edward Reifsnyder, a salesman at the Brenner Motors Automobile Agency in Harrisburg, loaned the car to Senk when he returned a recently purchased 1957 Chrysler Crown Imperial to the agency for repairs.

7. Trooper O'Donnell testified that Composites R9 and R11 are different, although R11 incorporates parts of R9. Composite R11 was never published in the newspapers although it was circulated throughout all PSP barracks and local police departments.

8. On August 2, 1961, James Landis, chief clerk in the Lancaster PSP Substation, reviewed a supplemental Criminal Investigation Report concerning the arrest of Frank Senk on May 29, 1961, for assault with intent to ravish Myrna Lugaro, 12, and Alicia Acosta, 13, of Christiana Borough, Lancaster County, on May 26, 1961. Landis suggested that Senk be checked out with reference to the Jane Benfield case. The recommendation was apparently overlooked since no action was taken at that time. See text, infra.

9. Lewisburg lies about thirty miles northwest of Centralia.

10. Charged with larceny before Justice of the Peace Dale Richart, Senk was released on his own recognizance with the understanding that he would make restitution.

11. Salada testified that when he later reviewed Senk's Criminal Investigation Report, he was impressed by the long record of sex offenses compiled by a man of Senk's age.

12. Yupco also testified that Lindner superimposed the negative of a photograph of Senk's profile over the sketch and discovered a remarkable resemblance between the two. Yupco stated that "(t)he negative fit just about right over the composite. It was amazing." Federal Hearing Notes at 107.

officer in charge of the Jane Benfield case.

Upon being so informed, Lt. Salada went to Mifflinburg on January 15, 1962, and interviewed Irene Bilger, 14, who told him that her would-be assailant was between 20 and 22 years of age, had a thin face, with dark curly hair hanging over his forehead, and that he had been wearing a suit. Although Salada could not recall if the composites were shown to Irene Bilger at that time, he did learn that Senk had recently purchased a Dodge convertible and that he was accustomed to trading in cars quite often.[13] From his investigation, Lt. Salada concluded that Senk required further checking out inasmuch as the modus operandi of the Irene Bilger incident was similar to the Jane Benfield case.

## SENK'S PRESENCE IN CENTRALIA

On January 17, 1962, Lt. Salada returned to the Centralia area and discovered that Senk, his wife Mary, and Stella Reitz, a telephone solicitor for the Civic Reading Club, had previously rented a storeroom at 811 Centre Street, Ashland, on July 5, 1961, from Elizabeth Schragen, paying her a monthly rent of $20 in advance. On that same date, Paul Staudenmeier rented an apartment at 102 Centre Street, Ashland, to three people [14] who had been referred to him by Elizabeth Schragen. On July 12, 1961, Mrs. Schragen overheard Senk tell his wife, in an excited tone, "Come on, we're going." She said the group departed in a hurry and that Senk told her sister, Mary Ann Corba, to keep the unused balance of the monthly rent. On July 13, 1961, the day after Jane Benfield's body was discovered, Staudenmeier saw the trio leaving the apartment and they explained to him that their Harrisburg office was dissatisfied with sales and that they were ordered to leave the area but would return next year.

## THE LAST FEW DAYS

On January 15, 1962, Lt. William Stanton assumed charge of the case and on that same date received information from a Corporal Walsh that while checking files in the central office, he had discovered an August 2, 1961, report [15] concerning Senk's arrest in Christiana Borough, Lancaster County, for assault with intent to ravish two minor children. As a result, Lt. Stanton took the following actions:

(1) Checked Senk's criminal record in the Bureau of Criminal Identification files.

(2) Assigned Detective Sgt. Rufus Williams to reinvestigate the attempted assault of Myrna Lugaro and Alicia Acosta in Christiana Borough on May 26, 1961,[16] in order to determine if

---

13. Chief of Police Hall Solomon informed Salada that Senk owned a 1961 Dodge, cream-colored convertible at the time of his arrest. There are several possible inferences which the PSP could have drawn from that fact as their investigation progressed. First of all, the fact that the Dodge was only recently purchased did not preclude the possibility that Senk had owned or driven a different make of car at the time of the murder. Furthermore, from the fact that Senk traded his cars in quite frequently, it was not farfetched for the PSP to assume that Senk may have been attempting to cover his tracks by disposing of any vehicle that may have been observed at the scene of an attempted crime.
Chief Solomon also told Salada that Senk appeared to be especially worried about the nature of the charges to be lodged against him.

14. Staudenmeier said that the male in the group was 5'5", thin, with an olive complexion and straight black hair, and that he wore a dark suit and was immaculate in appearance.

15. See n. 4, supra.

16. From his investigation, Det. Sgt. Williams learned that Myrna Lugaro, 12, was accosted on May 26, 1961, while on her way home from school for lunch. A driver stopped and asked her where the post office was. He then offered her money to get in the car, but she refused and ran home. She identified Senk from photographs. At that same time, Alicia Acosta, 13, was walking about 50 feet behind Myrna Lugaro, and when she reached the car, the driver also asked her directions to the post office, which was about three or four blocks away. She climbed in the car

there was some connection between that case and the Jane Benfield murder. On January 17, 1962, Williams reported to Stanton that Senk had been arrested for the assault on May 26, 1961, but that the case had been nol prossed with Senk paying the costs. He also reported that both girls had positively identified Senk from a photograph as their assailant. From Williams' report, the PSP concluded that the modus operandi of the Christiana incident was similar to the Jane Benfield case in that the driver first requested directions to the post office and then asked the young Miss Acosta to get in the car to show him how to get there.

(3) Sent Detective Arthur Cronin to the Civic Reading Club headquarters in Harrisburg on January 16, 1962, to confirm that Senk was in the Centralia area on July 11, 1961.[17]

(4) Ordered Detective Roy Titler to reinvestigate the murder of young Rebecca Ann Triska in Beaver County in 1958. Titler reported that Senk had been arrested on suspicion of murder but that the case against him had been dropped for lack of a corpus delicti. Titler reported that, if the body had been found, there would have been sufficient evidence to substantiate a charge of murder.

(5) Asked Detective Sgt. Ernst Strosahl and Trooper Samuel Yupco to reopen the case of assault on Irene Bilger which occurred in Mifflinburg on December 5 and 15, 1961. On January 18, 1962, after Det. Strosahl reported to Lt.

Stanton that Irene Bilger had identified Senk from both the composite and a photograph, he was instructed to file an information charging Senk with indecent assault. Det. Strosahl then obtained a warrant from Union County Justice of the Peace Dale Richart and it was, in turn, delivered to Det. Rufus Williams by Lt. Stanton.[18]

(6) Told Detective Kenneth Bundy to reinvestigate an indecent assault committed against Mrs. Ruth Flanders who had been accosted by a magazine salesman in her home in Bradford, McKean County, on April 30, 1961.[19] On January 18, 1962, Bundy reported to Lt. Stanton that Senk had been arrested for assault and battery on Mrs. Flanders and that, even though the charges against him were dropped, he was assessed the costs of prosecution and ordered out of the county.[20] On that same date, after Mrs. Flanders indicated her present desire to prosecute Senk, Bundy filed an information charging Senk with assault and battery with intent to ravish. Early that same afternoon, after obtaining a warrant, he left for Erie to meet Det. Williams and Det. Cronin in order to arrest Senk.

### THE WARRANTS

At the murder trial in Columbia County Court, Lt. Stanton testified as follows:

"Q. I understand you were the one who made the decision to have Frank picked up, is that correct?

and gave him directions. As the car neared the post office, the driver slowed down and pressed a quarter ($.25) into her hand. He then drove four or five blocks past the post office and offered her a ten ($10) dollar bill if she would go for a ride with him. At this point, the driver stopped the car, reached over and grabbed her by the left arm to pull her toward him. She shook him off, got out of the car and ran home. She identified the driver as Frank Senk.

17. See discussion supra, under Senk's Presence in Centralia.

18. An attempt was made to serve this warrant on Senk at his apartment in Williams-

port. However, it was learned that Senk was in the western part of the state at that time. See R 24.

19. L. Stanton apparently learned of this incident from Senk's fingerprint file which listed his prior criminal record.

20. Interviewed about 1:00 P.M. on January 18, 1962, Mrs. Flanders told Detective Bundy that a salesman from the Civic Reading Club visited her home on April 30, 1961, and grabbed her and kissed her. She described him as being 23 to 25 years of age, 5'9" to 5'10", slender, and wearing a dark colored suit, white tie and shirt.

A. That is correct.

Q. When was the decision made?

A. I was attempting to have Frank Senk picked up beginning January 15th.

Q. 1962?

A. That is correct."

Trial Notes at 650.

However, as will appear below, no attempt was made to pick up Senk until January 18, 1962. With respect to that, Stanton testified at the federal hearing as follows:

"Q. Twelve years ago at the time of trial, when asked when you gave the order to arrest Mr. Senk, you stated that it was on January 15, 1962.

A. It couldn't have been on the 15th because I didn't give any order to have Frank Senk arrested until I had the warrants issued.

Q. Couldn't it have been at that time that you were confused about the question or that you were confused about the dates, and that accounted for the reason you said January 15th?

A. That could have been.

Q. Or could it have been that January 15th was the date that you became in charge of the investigation; in fact, the date that Mr. Senk became a suspect in your mind?

A. That's correct. That would be on the 15th."

Federal Hearing Notes, at 200–201.

On cross examination, the following responses were elicited from Stanton on this point:

"Q. And Senk was arrested at approximately 9:00 o'clock Wednesday (sic Thursday), January 18th?

A. That's correct.

Q. And you made a decision to start picking him up on the 15th, as you just testified?

A. I think you're taking that statement out of context. I was endeavoring to get enough information on the 15th. Therefore it was my intent and I was working toward getting a legal document to pick Frank Senk up.

Q. But you did mention that if you could have picked him up on the 15th you would have?

A. If I had the legal document, I would have.

Q. And was he arrested under your order?

A. That's correct.

Q. And it is true, isn't it, he was in fact under arrest as of 9:00 o'clock Wednesday (sic Thursday), January 18th?

A. That's correct."

Federal Hearing Notes, at 240–241.

As stated before, Detective Bundy obtained an arrest warrant in McKean County on January 18, 1962, charging Senk with assault and battery with intent to ravish Mrs. Gloria Ruth Flanders on May 1, 1961,[21] and was ordered on January 18, 1962, to proceed to Erie to meet Detectives Williams and Cronin to arrest Senk. Also on January 18, 1962, Detective Ernst Strosahl and Trooper Samuel Yupco obtained a warrant from Union County charging Senk with indecent assault on Irene Bilger in Mifflinburg on December 5 and 15, 1962.[22]

Sometime between January 15 and January 18, 1962, after Lt. Stanton was

21. A charge of assault and battery against Senk was originally dropped by Mrs. Flanders. Detective Bundy obtained a warrant for his arrest on the more serious charge of assault and battery with intent to ravish.

22. This warrant was obtained after Det. Sgt. Strosahl interviewed (1) Mrs. Susan Neiden-sal into whose home Irene Bilger ran for safety after being chased by a man she identified as Senk; (2) Chief of Police Hall Solomon who had previously told PSP of his suspicions connecting Senk with the Irene Bilger incident; and (3) George Bilger, Irene's father. See R24.

informed of the investigation conducted by Detective Roy Titler into the disappearance of Rebecca Ann Triska in Beaver County in 1958, Stanton telephoned the District Attorney of Beaver County to determine if Senk had violated the terms of a five-year suspended sentence which he had previously received in Beaver County on a charge of sodomy. The district attorney informed Stanton that, due to the "political implications" surrounding Senk's arrest in 1958, a bench warrant would not be issued for him. With respect to that telephone call, Stanton, in a report dated January 23, 1962, (R 25) stated:

"The district attorney was apprised of all the facts concerning the suspect and the importance of the apprehension of this man on some charges other than the murder of Jane Benfield. It was stressed to him that this man was a sex degenerate and that there was no question that once he was interrogated it would reveal that he had committed this murder, and the bench warrant would be the legal means by which this suspect could be apprehended and kept in custody by this officer, for the purposes of interrogation. However, District Attorney Stewart flatly refused, due to the political implications that he felt would arise." (R 25 at 2) [23]

Similarly, Detective Sgt. Williams reported on January 17, 1962, that the charge of assault and battery for which Senk was arrested in Lancaster County had been nol prossed by the District Attorney who felt there was insufficient evidence to support a charge of assault and battery with intent to ravish. (R 25) Accordingly, a warrant was not obtained in Lancaster County.

Having learned from the Civic Reading Club that Senk was assigned to an office in Erie, Stanton dispatched Det. Sgt. Leo Weir and Det. Lewis Penman to the Erie area to determine his whereabouts and to arrest him. As seen from the foregoing recitation of facts, other than Stanton's statement at the trial to the effect that he was attempting to have Senk picked up on January 15, there is no evidence of any attempt made prior to January 18, after the warrants were obtained. This is in accord with Stanton's clarification of his trial testimony at the federal hearing, see quotation in text, P. 13, supra.

## THE ARREST

At 5:00 P.M. on January 18, 1962, Romaine Leddy, a telephone operator at the Civic Reading Club in Harrisburg, called PSP and informed them that she had just received a call from Senk. He asked her why the state police were looking for him and remarked that he was going to leave the "confines" and not return until he found out why.[24] He then stated that he would call her back at 8:00 P.M. Stanton interpreted Senk's remarks as an indication of his intent to flee the state and with that in mind he arranged a plan to intercept and trace Senk's return call in order to locate and arrest him on the spot.[25]

Shortly before 9:00 P.M. on January 18, 1962, Senk entered an outdoor phone booth in Russell, a rural area just outside of Warren, Pennsylvania, to call the Civic Reading Club. The call was traced as aforesaid and, at 9:15 P.M., the PSP,

---

23. This quote is taken from a report written by Lt. Stanton on January 23, 1962, detailing the progress of the investigation between January 15 and 18, 1962. However, the exact date on which the quoted discussion between Lt. Stanton and the district attorney of Beaver County occurred does not appear.

24. Senk in fact left the state after the 5:00 P.M. call but returned to Pennsylvania to make the call to Romaine Leddy shortly before 9:00 P.M.

25. The PSP knew that if Senk was going to make the return call, he would probably do so from within Pennsylvania since the Civic Reading Club was hooked into a WATS line system which did not extend beyond the state's borders. Accordingly, plans were made with the Bell Telephone Company to trace the call to its place of origin, and with Romaine Leddy to delay Senk on the phone as long as possible to permit the PSP to move in on him.

having pinpointed Senk's location, moved in and took Senk into custody as he stepped out of the booth. Trooper Henry Miller, who effected the arrest, did not inform Senk of the charges against him at that time.

## IN CUSTODY

The facts surrounding the custodial interrogation of Senk were adduced at the 1962 murder trial in Columbia County. The trial judge made extensive findings of fact which, after a complete review of the record, I find to be fully supported. Those facts, as amplified by the testimony produced at the federal hearing, are as follows:

After his arrest, Senk was transported, without interrogation, by Trooper Miller to the Warren Substation,[26] located about seven miles away. Senk's wife, Mary, who was waiting in Senk's car, followed. They arrived at the barracks about 9:30 P.M. at which time Senk was searched and placed in a combination kitchen-office [27] to await the arrival of officers from the Detective Bureau in Harrisburg. During this interval, there was no conversation between Senk and officers of the PSP and, after about a half-hour had passed, Senk appeared to fall asleep. Mary Senk waited in the day room which was furnished with lounge chairs and a television set. She did not speak with her husband until early the next morning.

Shortly after 1:00 A.M. on Friday, January 19, 1962, Detectives Bundy, Williams, and Cronin arrived at the Substation. Detective Williams carried the Union County warrant, but never served it. Detective Bundy was armed with the McKean County warrant,[28] but he did not serve it at that time. Senk was turned over to their custody without being interrogated.[29]

At about 1:25 A.M., Mary Senk was called into the combination kitchen-office where Senk told her that he was being held for questioning. He then endorsed some checks in his possession over to her along with other currency and told her to return to the motel room they had rented near Jamestown, N.Y. She left about 1:30 A.M. driving Senk's car.

Senk and Detectives Williams, Bundy and Cronin left the Warren Substation about 2:00 A.M. and traveled along Route 6 through McKean County to the Ridgeway substation in Elk County, located some 40 miles away.[30] The party

26. Trooper Miller testified:
 "A. Upon observing this '62 Dodge Convertible, I immediately stopped my state vehicle beside a telephone both, and walked up to the party that was inside the booth at the time. I then asked the subject as he was walking from the telephone booth, 'Are you Frank Earl Senk?' He advised me, 'Yes, I am.' I said, 'Would you please come with me to the Warren Substation, where there will be several men wanting to talk to you.' He shrugged his shoulders, and said, 'Ok' or words to that effect. I told him then to get in the state vehicle which he did." Trial Notes, at 458–459.

27. The Warren Substation had been converted from a late model house into a barracks.

28. Sometime after January 20, 1962, the McKean County warrant was lodged as a detainer in the Columbia County Jail.

29. Shortly after arriving at the Warran Substation, Detective Williams testified that he spoke separately with Senk and his wife. The conversation, however, was not in the form of interrogation, as seen from Williams' testimony:
 "A: I told the defendant, Frank Earl Senk, that we wanted to talk to him about his sex life, and I asked him if he wanted his wife informed of that fact, and he said that he did not.
 "Q: And what did you proceed to do then?
 "A: I then asked him what disposition he wanted of his wife, and he informed me he wanted his wife to return to the motel that they had rented and to check out, and then to proceed to the home of his mother where their infant child was being kept." Trial Notes, at 548.

30. On cross examination at the federal hearing, Detective Bundy testified that the party passed the Kane Barracks in McKean County en route to Ridgeway. They did not stop there, however, because the Kane Barracks was being remodeled and there were no rooms for them.
 On recross examination, Detective Williams stated that Warren County, where Senk was

arrived there about 3:20 with little or no conversation along the way. Senk appeared to sleep during the trip.

Upon their arrival at Ridgeway, the party had coffee and snacks. At about 4:30 A.M., Williams and Cronin began questioning Senk about his past sex life in general and not about any specific accusations. At this time, Senk was in a combination kitchen-report room where he remained for the rest of the day, except for brief periods when he left for the bathroom.

At about 8:45 A.M. on January 19, Mrs. Senk returned to the Warren Substation and was told that her husband had left a message for her to go to the home of his parents in Polk, Pennsylvania. She was also told to direct further inquiries about her husband to Lt. Stanton at headquarters in Harrisburg. Mrs. Senk testified that she made no further efforts to locate Senk on that day since his parents did not have a phone.

At about 9:00 A.M. on January 19, Williams and Cronin went to a nearby restaurant for breakfast. On their return, about 10:00 A.M., they brought Senk an egg sandwich and milk which he had requested and the conversation was suspended while Senk was eating. However, while they were gone, Detective Bundy began questioning Senk for the first time relative to his part in the alleged assault on Mrs. Flanders. Some-

time between 9:30 and 9:45 A.M., when he and Senk were alone, Detective Bundy shoved the McKean County warrant across the table to Senk and said, "I have a warrant for your arrest."[31] Detective Bundy then took an unsigned statement from Senk concerning the McKean County incident and typed it up.

After Senk finished eating, Williams and Cronin resumed their conversation with Senk, continuing until sometime before noon. At that time, Troopers McCole and Salada arrived from the Hazleton District and talked with Senk until shortly after noon when they went out for lunch.[32] However, before McCole began questioning Senk, he testified that he told Senk that he need not answer any questions.[33]

The officers returned from lunch about 1:00 P.M., bringing back the hamburgers and coffee which Senk had requested. Senk finished eating about 1:30 P.M. at which time Cronin and Salada resumed their conversation with him, concluding it at 2:45 P.M. At that time, Williams and McCole took over and continued questioning Senk until about 3:30 P.M. when Lt. Stanton and Sgt. McCartney arrived from Detective Headquarters in Harrisburg. They talked with Senk until about 5:00 or 5:30 P.M.[34] at which time all conversation with him terminated for the day.

arrested, was in the jurisdiction of the Erie Troop, while McKean County, where the warrant was obtained, lay in the jurisdiction of the Punxsutawny Troop. Detective Williams indicated that Senk was transferred to the Ridgeway Substation since, except for the Kane Barracks, that was the closest station to McKean County within the Punxsutawny Troop. The Warren and Kane Substations were located in downtown areas, while Ridgeway was situated in the country. There were, however, houses on both sides of the Ridgeway Substation.

31. At the murder trial, Bundy said a warrant was never served on Senk. At the federal hearing, Bundy attempted to clarify his trial testimony by stating that he felt the question asked at the trial referred to a murder warrant.

32. Trooper McCole testified on cross examination that during this interval he showed two photographs of Jane Benfield to Senk, one taken of the body at the scene and the other, a graduation picture. Trial Notes, at 784.

33. McCole testified:
"At that time I said to him, 'I have some questions to ask you,' after I made the identification of myself and Trooper Salada. I said, 'However, you don't need to answer my questions; you don't need to answer any questions for me; you are not compelled to.' He answered and said, 'I will answer the questions that I can.'" Trial Notes, at 781.

34. During this period, Lt. Stanton testified that he had Senk disrobe for about five

At 7:00 P.M., Bundy and Salada took Senk to the Elk County Jail, since, as Bundy testified, that facility afforded the only available accommodations for Senk. Bundy also testified that he showed the McKean County warrant to Mrs. Sandburg, the matron. Mrs. Sandburg described Senk's physical condition as good and his appearance as neat. At 8:00 P.M., Salada delivered hamburgers and milk to Senk since the jail's kitchen was closed when he arrived. The matron's husband gave the sandwiches and milk to Senk who was confined in a cell by himself. The matron and her husband resided on the second floor over the cell block and they described the outside temperature as very cold, and the inside temperature as very warm.[35]

Mr. Sandburg locked the jail up at 9:00 P.M. on January 19, 1962, and no one spoke with Senk from 8:00 P.M. that evening until 7:30 A.M. the next day when Mr. Sandburg served Senk a breakfast of double coffee, toast, bread, bran flakes, and cream. Senk registered no complaints with Mr. Sandburg and his appearance remained neat and natural.

At 9:30 A.M. on January 20, Bundy and Cronin picked Senk up at the Elk County Jail and returned him to the Ridgeway Substation, arriving there about 9:45 A.M. At 10:00 A.M., Kenneth Blair, a laboratory technician from Ridgeway Hospital, took a voluntary blood sample from Senk for the purpose of typing it. Senk's blood was found to be Type "A", the same as the victim's,

while a spot of blood found on the victim's summer shorts turned out to be Type "O".[36]

A PSP polygraph examiner, Corporal Charles T. Baker, arrived from Greensburg about 10:00 A.M. and about 11:00 A.M. began talking with Senk alone in the kitchen-report room. At Senk's request, Baker explained the techniques and objectives of the examination, but Senk refused to submit to the test. Like some of the discussions held with other officers, the conversation eventually centered around the subjects of religion, sin, and penitence, so that when the polygraph examiner concluded his interview at noon, Senk requested that he be permitted to talk with a minister. Corporal Baker left Senk at 12:05 P.M. and notified Lt. Stanton of Senk's request. Stanton then spoke with Senk for about 15 minutes.

At 12:20 P.M., Lt. Stanton selected the name of Rev. James H. Cousins, a Methodist minister in Ridgeway, from a telephone book and called his home. Since the minister was not available at the time, Stanton left a message to have him call the barracks as soon as he returned. Rev. Cousins returned about 10 minutes later, called the barracks and was requested by Lt. Stanton to come to the substation.

During the noon hour, the officers went out for lunch, and upon their return about 1:00 P.M., they gave Senk the sandwiches and milk he ordered. He ate while awaiting the minister's arrival.

---

minutes so that he could take a "cursory glance of his body." Trial Notes, at 670. Also during this interval, Stanton said that he and Senk had a discussion about psychiatric care, and that he saw tears in Senk's eyes. Trial Notes, at 654.

35. Mrs. Sandburg testified that she selected Senk's cell, a 5' by 8' room, because the toilet and water facilities were working. The cell was also furnished with a cot constructed of interwoven metal straps. Senk, however, was not provided with a mattress, towel or toilet paper, but neither did he request any of those items. The entire jail was heated through a central unit, controlled by a thermostat, and

Mr. Sandburg testified that Senk did not complain about the heat and that he did not feel that it was too hot.

36. In a supplemental report (R 25) dated January 23, 1962, Lt. Stanton explained:

"This difference in the type of blood, according to Lt. Peter Strickler of the Penna. State Police Crime Laboratory, could possibly be caused by the action of previous detergent washings of the shorts. The residue of the detergent remaining in the garment fibers causes a chemical reaction that changes the true type of the dried blood and invariably results in no other type than 'O'."

Rev. Cousins arrived at the substation about 1:30 P.M. After a short conversation with Lt. Stanton, the minister "spent between a half hour and an hour" with Senk alone behind closed doors.[37] The minister found that Senk was "composed; he looked well. He conversed quietly, he did not seem at first to be in any way distraught or distressed." [38]

Stanton testified that he was using the minister as an aid in the investigation and that he would not have called him if he felt he would hinder the investigation. Stanton also asked Rev. Cousins if he would reveal what Senk told him. However, Rev. Cousins told Stanton that "it was against his religious principles or against the rules of the church, and that he would have to think very deeply before he would relay any information to us." [39]

Rev. Cousins left the substation about 3:00 P.M. After he left, various officers, including Stanton, Cronin, McCartney and Salada, at different times continued their discussions with Senk along a religious vein until sometime between 5:00 and 6:00 P.M. when Senk suggested to Stanton and McCartney that Rev. Cousins was a disguised police officer who had attempted to deceive him. In response, Lt. Stanton offered Senk the telephone book to call the minister himself. Senk accepted but the minister was not home. At about 6:00 P.M., Senk again called Rev. Cousins and asked him to return to the barracks. Rev. Cousins agreed.

Supper was served between 6:00 and 7:00 P.M., with little or no conversation.

Rev. Cousins arrived back at the substation around 7:00 P.M. and spent the next hour alone with Senk behind closed doors.[40] Rev. Cousins came out of the room about 8:00 P.M. and informed Lt. Stanton that Senk wished to talk with his wife and mother. Sgt. Weir was sent to pick them up at Polk. Rev. Cousins returned to the room with Senk and left about 8:30 P.M.,[41] when Senk was taken to a bedroom where he stretched out on a bed. He appeared to sleep until the minister returned.[42]

---

37. Senk's counsel offered to prove that Lt. Stanton and Detective Williams went to the basement beneath Senk's room in an attempt to bug it during the minister's second visit, see test infra. Williams, however, denied being in the basement and Stanton testified that there was no basement beneath Senk's room. Accordingly, I conclude that any attempt at bugging proved unsuccessful.

38. Trial Notes, at 675.
However, Rev. Cousins also testified on cross examination as follows:
"Q: You have testified a number of times that Frank was composed, did you ever see him when he was not composed?
"A: I believe not.
"Q: Reverend, did you ever tell me that you saw Frank Senk crying?
"A: Yes.
"Q: You made that statement to me?
"A: Yes, but it applies to confession.
"Q: But you did see him when he was not composed then?
"A: Yes, sir."
\* \* \* \* \*
"Q: You testified that you were there on Saturday morning?
"A: Yes, sir.
"Q: I think you testified you were there a half hour to an hour on that occasion. Did you see him cry on that occasion?

"A: Yes, in the course of counseling.
"Q: And then you came back around 7:00 o'clock in the evening, did you see him cry on that occasion?
"A: Yes, sir, in the course of counseling.
"Q: Then I think you testified that you were present when his wife and mother were there?
"A: Yes, sir.
"Q: Did you see him cry at that time?
"A: No.
"Q: Did you see his wife and mother cry at that time?
"A: I thought they were exceptionally well composed and quiet."
Trial Notes, at 687–688.

39. Federal Hearing Notes, at 239.

40. See n. 37, supra.

41. Rev. Cousins testified that during this interview Senk was quiet and composed and that his physical appearance was excellent. Trial Notes, at 678.

42. Detective Cronin testified at trial, that at 8:30 P.M. he returned from a Ridgeway restaurant and served Senk a hamburger, two cups of coffee with milk and various cookies. Trial Notes, at 721.

At about 12:30 A.M. on January 21, Rev. Cousins returned to the barracks, at which time he asked a Dr. Consolo to stand by in the event he were needed.[43] Senk's wife Mary and his mother arrived at the substation at 1:00 A.M. Rev. Cousins and Mary Senk then talked privately with Senk for about 15 minutes in the bedroom where he had been resting. Mary Senk then came out of the room crying and told Detective Williams that Senk said he killed the girl.[44] Senk's mother entered the room and remained there privately with her son and the minister for about 10 minutes.

At that point, the minister left the room and Lt. Stanton entered, but Senk and his mother continued to talk for sometime out of the officer's hearing. When Senk requested to talk with his wife again, she was called into the room and the three conversed for approximately another 10 minutes in such a way that Lt. Stanton could not overhear.

At 1:35 A.M., Senk's wife and mother left the room and Senk grabbed Lt. Stanton by the sleeve of his coat and said, "Lieutenant, I better tell you before I change my mind." For the next ten minutes Senk related his involvement in the crime to Stanton, after which he agreed to have it reduced to writing. Senk and Stanton came out of the room about 2:00 A.M. and entered the office-kitchenette. At this point, Rev. Cousins bade farewell to Senk and gave him a copy of a devotional booklet from his church. In addition, the minister testified that Senk at that time was "in every sense in command of himself." [45] In the meantime, Senk's wife and mother left in a police car to be driven to the mother's home in Polk and, after Rev. Cousins left, Sgt. Williams started to type the narrative statement in the presence of Senk and several other officers.

At about 3:00 A.M., Williams finished typing the statement. He handed Senk a copy and read it aloud for him to follow along. Senk made some corrections with pen and ink and then signed it in the presence of Williams, Cronin, Salada, McCole and Stanton, who also signed as witnesses.

After Senk, McCole, Cronin, Salada and Williams had coffee and cookies, they departed, at 4:10 A.M. for Bloomsburg, stopping at 7:00 A.M. in Lewistown for breakfast. Senk appeared to sleep en route from Ridgeway to Lewistown but remained awake from Lewistown to Bloomsburg. Upon arrival at the Bloomsburg barracks shortly after 8:00 A.M., Senk was placed in a bedroom where he stayed until 10:30 A.M. when he was awakened. After washing and shaving, Senk and four officers left between 10:45 and 11:00 A.M. by car for Centralia to enable him to reenact the crime. They returned to the Bloomsburg barracks at 12:15 P.M. where he was fingerprinted and again taken to the bedroom. He was allowed to rest until 3:00 P.M. At that time, Senk was taken to the office of a Justice of the Peace for a preliminary hearing. News pictures were taken of him in police custody at that time, and the Commissioner of the PSP issued a news release detailing the history of the crime, the investigation, the fact that Senk had confessed, and his past criminal record. After the hearing, Senk was committed to the Columbia County Jail on a charge of murder.

At about 1:00 P.M. on January 22, Senk signed a pauper's affidavit, prepared and submitted by the district attorney, in support of his petition for the appointment of counsel. Counsel was designated that same day, and his first interview with his attorneys was held on January 23, 1962.

At about 2:00 P.M. on January 22, Senk was again returned to the scene of the crime where he was observed by two

---

43. Senk's wife was expected to be traveling with her six-week old baby.

44. Williams apparently did not know which girl was meant at this time since Senk was also suspected in the Rebecca Ann Triska case.

45. Trial Notes, at 686.

groups of residents of Centralia. At that time, Senk also identified a 1955 Pontiac station wagon similar to the one he used on July 11, 1961. He was then returned about 5:00 P.M. to Columbia County Jail where he remained until his trial.

The trial judge resolved the credibility issues centering around Senk's custodial interrogation in favor of the Commonwealth's witnesses and against Senk and his wife. He also concluded that Senk "was interrogated without force, threats, violence, ill treatment or deprivation of food or sleep at various times by various officers about his past conduct in general and his knowledge of the particular crime in question specifically beginning on Friday, January 19th, at about 4:30 o'clock A.M. and ending on Saturday, January 20th, at approximately 5:00 o'clock P.M." He also noted that the police testified that Senk did not request counsel, but that Senk testified that he requested counsel on several occasions. The trial judge, however, concluded that Senk's testimony "in this regard is vague and indefinite as to the number of times, when and to whom the requests were made." Finally, the trial judge found that Senk was not told that he had a right to counsel or to remain silent, except for the warning contained in the opening paragraph of his confession. The trial judge, however, did find that:

"From all of the surrounding circumstances, we are satisfied the defendant was well acquainted with his rights, that he knew full well what he was doing, and after talking his predicament over with his mother, wife, and minister, he decided to unburden his conscience and confess his guilt." [46]

Opinion of November 24, 1964, page 20.

46. During cross examination of Lt. Stanton at trial, the following testimony was adduced:
"Q: Did you at any time advise Frank of his constitutional rights?
"A: We had a conversation about his rights.
"Q: When was that?

## DISCUSSION

## I. THE FOURTH AMENDMENT CLAIM

In his petition for a writ of habeas corpus, petitioner first claims that his confession should have been excluded from evidence since it was tainted by his illegal arrest and detention.

In Wong Sun v. United States, 371 U. S. 471, 485, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963), where federal narcotics agents burst into the bedroom of the defendant Toy without probable cause and obtained incriminating statements from him, the Supreme Court held that:

"Verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officers' action in the present case is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion."

Eight years later, the Third Circuit Court of Appeals in United States ex rel. Gockley v. Myers, 450 F.2d 232, 238 (3rd Cir. 1971), expanded on the principles announced in Wong Sun and held, in a habeas corpus action, that:

"The wrong in this case, the 'taint,' is not merely the illegality of the initial arrest but also the illegality of the continuing detention pursuant to illegal arrest for the purpose of controlled, persistent and repeated questioning such as could not have been accomplished without arrest and detention."

Underlying the Court's rationale were the facts that:

"The arrest (without probable cause) of Gockley on November 17 (1960) was much more than a causa sine qua non of his November 19 statement during the resulting deten-

"A: On January 19th.
"Q: What did he say?
"A: He made the suggestion; he said he was well aware of his rights, and that he had been involved with the police many times, and that he went through two or three court trials." Trial Notes, at 659.

tion. The record compels the conclusion that the very purpose of the arrest on a charge of forgery was to obtain and maintain such control over him as would facilitate persistent and effective interrogation about the disappearance of Smith and Miss Klein. This deliberate misuse of arrest is underscored by the fact that Gockley was never granted an arraignment or a bail hearing on the forgery charge. At the hearing in the district court on the petition for habeas corpus, Captain Feltman, the Reading police officer who had been in charge of the Gockley case, was asked why Gockley was not taken before a magistrate. He replied that he did not know, except that they were questioning him. Moreover, much of the questioning was addressed to the obtaining of information about the disappearance of Smith and Miss Klein, rather than the forgery charge upon which he was never prosecuted." Gockley, at 236.

In order to bring himself within the rule announced in Gockley, petitioner claims, in the alternative, that he was arrested (1) without probable cause; (2) without a warrant when the PSP had sufficient time to obtain one; and (3) under sham pretenses.

### (a) Probable Cause

■ Probable cause does not consist of a premeasured set of ingredients. Each fact must be detailed and analyzed in light of the surrounding circumstances. As stated in Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949):

"Probable cause exists where 'the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed. Carroll v. United States, 267 U.S. 132, 162 [45 S.Ct. 280, 288, 69 L.Ed. 543] (1925)."

■ More particularly, when law enforcement officials seek the issuance of an arrest warrant, they (1) must justify a finding of probable cause to believe that the offense has been committed and (2) must demonstrate a sufficient basis for a finding of probable cause that the party suspected committed the offense. United States ex rel. Grano v. Anderson, 446 F.2d 272 (3d Cir. 1971); Commonwealth v. Kenney, 449 Pa. 562, 297 A.2d 794 (1972); Commonwealth v. Marino, 435 Pa. 245, 255 A.2d 911 (1969). There can be no doubt in this case that Jane Benfield had been the victim of a violent sex slaying. Since Senk was not arrested at the scene, the issue is whether the PSP had sufficient data in their possession as of January 18, 1962, to justify the issuance of a warrant for his arrest. See Whiteley v. Warden, 401 U.S. 560, 565–566, 91 S.Ct. 1031, 28 L.Ed. 2d 306 (1971). There must have been more than mere suspicion. Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959).

At the outset, Senk points to certain testimony of Lt. Stanton as constituting an admission that the PSP did not have probable cause to arrest Senk. During the federal hearing, Maj. Stanton testified on cross examination as follows:

"Q: Now, is the reason a murder warrant was not obtained because you didn't have sufficient information to put before a J.P. to issue a murder warrant?

"A: That's correct."
Federal Hearing Notes, at 241–242.

"The Court: Okay, did you know if —and I realize and I can understand how this is asking a lot some eleven and a half years later—but did you know when you were making up your mind about Mr. Senk whether any of those people who claimed to have seen him in the Centralia area described the color of his hair and the color of his eyes, or any other physical characterizations at all?

"The Witness: (Maj. Stanton): No, I didn't take too much of that into

consideration, Your Honor. My thoughts were focused in on the fact that he had this previous record of sex offenses. The fact that we learned that he had been in the area of Centralia at the particular time of the murder, indicated to me that he was the prime suspect.

"The Court: I mean there were other factors I'm sure that came to your mind?

"The Witness: I was almost convinced when he (Senk) made the telephone call at 5 o'clock and gave an indication he might leave. I mean stay out of the state. I assumed at this time that this was in a sense fleeing."

Federal Hearing Notes, at 224.

■ As the facts reveal, prior to January 15, 1962, when Lt. Stanton assumed command of the investigation and decided to have Senk picked up, the PSP had interviewed a number of persons in order to obtain a description of the suspect and to reconstruct the circumstances of the crime. In fact, it was revealed that two composite sketches of the suspect were produced through those descriptions, one of which, Composite R11, was instrumental in placing the PSP on Senk's trail. In any event, the mere subjective conclusions of a police officer concerning the existence of probable cause is not binding on this court which must independently scrutinize the objective facts to determine the existence of probable cause. Klingler v. United States, 409 F.2d 299 (8th Cir. 1969). Moreover, since the courts have never hesitated to overrule an officer's determination of probable cause when none exists, consistency suggests that a court may also find probable cause in spite of an officer's judgment that none exists. As phrased in United States v. Day, 455 F.2d 454, 456 (3d Cir. 1972):

"Here, the policeman testified that he did not have probable cause to search, and at best was merely suspicious. Of course, we would not consider ourselves bound by a police officer's inability to articulate his conclu-sions if the facts clearly demonstrated the existence of probable cause . . . ."

■ Consequently, we must proceed to sift the evidence to determine if probable cause, in fact, existed at the time Senk was arrested.

To recap from the mosaic of facts previously outlined on the issue of probable cause, we note that the PSP, prior to the arrest of petitioner, had the following information:

Frank Earl Senk, employed as a traveling salesman by the Civic Reading Club of Harrisburg, along with his wife and a fellow employee, rented an apartment and storeroom in Ashland on July 5, 1961. Senk paid the monthly rent on the storeroom lease in advance.

Centralia, the hometown of Jane Benfield, the victim, lies about 2½ to 3 miles north of Ashland. Since Centralia, in 1961, was a small depressed community with about a thousand elderly residents, it is not farfetched to infer that the slightest occurrence out of the ordinary would have drawn attention. And so it was, that for about a week and a half prior to the disappearance of Jane Benfield, Eleanor Stasulevich noticed a blue car pass by Jane Benfield's home every day about 10:00 A.M. Her husband, Alex, had also seen the car on the day of the murder. Both gave the same description of the driver to the PSP. On the day prior to the murder, JoAnn O'Connor spotted a faded blue Ford station wagon traveling toward Jane Benfield's home at three different times. She likewise furnished the PSP with a description of the driver.

On July 11, 1961, shortly before Jane Benfield was seen entering a two-toned blue station wagon near her home, the driver of what was believed to be a 1958 Pontiac Safari station wagon, with a dark blue bottom and light blue top, attempted to pick up two young girls, Eva Ann Bogdonas, 13, and Linda Wertz, 13, on 11th Street in Ashland. Because of the close temporal and spatial relationship between the Ashland incident and

the murder of Jane Benfield, the description furnished by the two girls was of direct probative and investigatory value.

At about 9:40 A.M. on Monday, July 10, 1961, John May Sr., 74, saw Jane Benfield enter a blue and white station wagon, after she had apparently given directions to the driver. May said the driver had a full round face. On July 11, 1961, the day of the murder, Centralia Chief of Police William Johnson saw Jane Benfield riding in a dark blue or green car, but could not remember the exact time of day, or the direction in which the car was heading: Jane Benfield obscured his view of the driver. Finally, on July 11, Joseph Kowitski noticed Jane Benfield riding in a blue station wagon headed toward Aristes. He gave the PSP a description of the driver.

From the descriptions furnished by Joseph Kowitski and Eleanor and Alex Stasulevich, an artist for the PSP was able to create a composite sketch of the driver, Composite R9. And later, by incorporating certain aspects of Composite R9 with information supplied by JoAnn O'Connor, the same artist created a second, different sketch, Composite R11. That composite was distributed throughout the PSP system and local police stations and later proved instrumental in connecting Senk with the slaying of Jane Benfield.

Of the three persons who had seen Jane Benfield riding in a car, only John May, Sr. described the shape of the driver's face. From this, petitioner deduces that the PSP were constrained to search for a man with a "full round face". While interesting, petitioner's argument ignores the other bits and pieces of information available to the PSP. For example, John May, Sr. said he observed the driver on Monday, July 10. Jane Benfield, however, was not reported missing until Tuesday, July 11.[47] In view of that discrepancy, I do not believe the PSP were compelled to rely solely upon the information supplied by this one witness. It must be remembered that JoAnn O'Connor, Eleanor and Alex Stasulevich had each given descriptions, and although the man they described was not actually seen with Jane Benfield, I believe there to have been a sufficient nexus. In addition, descriptions were also furnished by Eva Ann Bogdonas and Linda Wertz. All of those descriptions constituted part of the data being stored up by the PSP. And finally, although the PSP did not learn what type of car Senk was driving on July 11th until after he was arrested, the description by each witness of the make, type and color of the car may have proved useful in attempting to connect one incident with the other.

On July 13, 1961, the day after the body of Jane Benfield was discovered in an abandoned mining area off the road leading to Aristes, Senk, his wife, and his co-employee, hurriedly left Centralia. Senk explained to his landlord that sales had proved unsatisfactory and that he would return the following year. Senk did not claim the balance of his monthly rent and was overheard telling his wife "Come on, we're going."

In December, 1961, Senk was arrested for larceny. A check of his fingerprints revealed that Senk had previously been arrested and/or convicted of a number of sex-oriented crimes. Among other things, the PSP were alerted at the time to the facts (1) that Senk had been arrested in Lancaster County on May 29, 1961, for assault and battery with intent to ravish Myrna Lugaro, 12, and Alicia Acosta, 13; (2) that he was suspected in the 1958 murder of young Rebecca Ann Triska in Beaver County; (3) that he was charged with assaulting Mrs. Gloria Ruth Flanders on May 1, 1961, in McKean County; and (4) that Mifflinburg Police Chief Hall Solomon suspect-

---

47. Given May's age and the fact that other witnesses, who had observed Jane Benfield riding in a similar vehicle, fixed the date as July 11, the PSP could have concluded that all of the witnesses were describing a single occurrence which took place on July 11.

ed Senk of attempting to assault Irene Bilger, 14, in Mifflinburg, Union County, on December 5 and 15, 1961.[48] It was also later brought out that Senk was serving a parole sentence imposed in Beaver County on a charge of sodomy. Subsequently, Trooper Lindner, the arresting officer, positively identified Senk from Composite R11, and found an "amazing" match when he superimposed a negative of Senk's photograph over the sketch.

When Lt. Stanton took charge of the Jane Benfield case on January 15, 1962, he was apprised of the above information, and he was so concerned that he immediately dispatched several teams of officers to Lancaster, Beaver, McKean and Union Counties to reinvestigate the crimes in which Senk had been previously implicated. By this time, similarities began to appear in the modus operandi of the murder of Jane Benfield and the attacks on Myrna Lugaro and Alicia Acosta in Lancaster County and Irene Bilger in Mifflinburg, Union County. As a result of the information derived from those investigations, Lt. Stanton directed that warrants for Senk's arrest be obtained in Union and McKean Counties, charging Senk, respectively, with indecent assault and assault and battery with intent to ravish.

Finally, at 5:00 P.M. on January 18, 1962, Senk called the Civic Reading Club in Harrisburg and told the telephone operator that he was going to leave the "confines" and not return until he found out why the PSP were looking for him. Lt. Stanton interpreted Senk's remarks to mean that he was about to flee the state, and accordingly, he directed that arrangements be made to intercept and trace another phone call which Senk promised he would make at 8:00 P.M. that same evening.

This then is not such a case as was presented in Commonwealth v. Goslee, 427 Pa. 403, 234 A.2d 849 (1967), where it was held that probable cause for an arrest could not be established by the mere presence of a person with a prior criminal record at the scene of the crime. There was much more here for the PSP to act upon. They knew that Senk, a man with a history of sexual offenses, had been in Centralia at the time of the murder and that he had left hurriedly shortly thereafter. They knew that he matched the descriptions furnished by several witnesses who had seen him with Jane Benfield at and about the time of her disappearance, and that a man fitting his description had accosted two young girls in the nearby town of Ashland a few minutes earlier. They were also aware that Senk had been implicated in several prior attempts to pick up teenage girls and that the modus operandi followed in those attempts was similar to the case under investigation. And finally, they were alerted to the fact that Senk was attempting to flee the state after he learned that the PSP were looking for him. Those facts loosely parallel the circumstances depicted in United States ex rel. Hollman v. Rundle, 461 F.2d 758 (3d Cir. 1972) (per curiam), in which probable cause was found to exist where a sufficiently detailed description of the suspect was broadcast over a police radio, and the suspect was seen one night later near the scene of the crime in the company of a man closely fitting a second description. Accordingly, I conclude that on January 18, 1962, the PSP had probable cause to arrest Senk for the murder of Jane Benfield.

*(b) The Warrantless Arrest Argument*

Senk next contends that his arrest, and consequent detention, were illegal since the PSP arrested him without a warrant for murder when they had ample time to secure one.

In Jones v. United States, 357 U.S. 493, 499–500, 78 S.Ct. 1253, 1257, 2 L.

---

48. PSP were also told that Senk appeared to be especially worried about the nature of the charges to be lodged against him. They also learned that Senk had recently purchased a new Dodge convertible, and that he traded cars in frequently.

Ed.2d 1514 (1958), Mr. Justice Harlan, speaking for the Supreme Court, stated:

"These contentions, if open to the Government here, would confront us with a grave constitutional question, namely, whether the forceful night-time entry into a dwelling to arrest a person reasonably believed within, upon probable cause that he had committed a felony, under circumstances where no reason appears why an arrest warrant could not have been sought, is consistent with the Fourth Amendment." [49]

Cf. United States v. Davis, 461 F.2d 1026 (3rd Cir. 1972) (where the same question was again left open).

█ Petitioner, however, was not arrested in his home, but rather outside a public telephone booth. This distinction is crucial, as was recognized in Dorman v. United States, 140 U.S.App.D.C. 313, 435 F.2d 385, 389 (1970), where the Court offered:

"The Fourth Amendment provides protection even as to arrest in a public place, though in such cases the requirement is only that there be probable cause and there is no additional requirement of recourse to a warrant.

A greater burden is placed, however, on officials who enter a home or dwelling without consent. Freedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment. In general a home may not be searched without a warrant notwithstanding probable cause."

That same point had been previously emphasized in Ford v. United States, 122 U.S.App.D.C. 259, 352 F.2d 927 (1965), where the Court not only found that a warrant for an arrest in a public place is not needed in spite of the fact that it was practical to obtain one, but also declined to adopt such a rule in the exercise of its supervisory jurisdiction. The Court, sitting en banc, stated at p. 932:

"There thus appears in the law a difference, on the one hand, in what is considered reasonable and therefore necessary to justify a search and seizure in a home or occupied premises, from what, on the other hand, is reasonable and sufficient to justify a felony arrest in a public place. A warrant has not been required for the latter if there is probable cause, though it may have been practical to obtain a warrant. This difference is not only

---

49. At oral argument held before the Supreme Court on January 20, 1972, in the case of Johnson v. Louisiana, 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972), the question left open in Jones v. United States, supra, was raised as a secondary issue. The following exchange, as reported in 10 Crim.Law Reporter 4136, took place at oral argument:

"No hot pursuit or emergency was ever shown in this case, Mr. (Richard A.) Buckley (of New Orleans) said, it simply involved a Louisiana policy of never obtaining arrest warrants in robbery or other violent felony cases. The police testified that there was no other reason that they did not get a warrant. Obviously, counsel said, they could not have obtained one; they did not know even the date or place of the offense.

"Mr. Justice White: Assuming there was probable cause, is there some case in the Court that holds there is a constitutional requirement for a warrant for an arrest—as distinguished from a search?

"No, Mr. Buckley replied, but in all cases setting up exceptions to warrant requirements, you have implied such a rule whenever there is an entry of the suspect's home.

"Mr. Justice White: You would not be making the same argument if he was arrested on the street—assuming probable cause.

"No, then we would just examine the probable cause, counsel responded. Aggravating factors in this case are that there was a thorough search of his house, and that he was never tried for that robbery."

In its opinion filed May 22, 1972, the Court did not reach the issue presented at oral argument since there was "no evidence that might properly be characterized as the fruit of an illegal entry and arrest (which) was used against him at his trial." 406 U.S. at 365, 92 S.Ct. at 1626.

reflected in decisional law. It gains support from statutes explicitly authorizing warrantless arrests on probable cause, statutes which have been relied upon by the Supreme Court, thus implicitly recognizing their constitutionality."

Accordingly, under the circumstances of this case [50] I do not believe that an arrest warrant was constitutionally mandated.[51] In any event, at the time Senk was arrested, Det. Sgt. Bundy had secured an arrest warrant from McKean County. That Trooper Miller, the arresting officer, was justified in taking Senk into custody on the basis of that warrant despite the fact that he did not have it in his possession was established in Whiteley v. Warden, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971). Moreover, even if that warrant were later to be declared invalid, the failure of the PSP to obtain another one was justified by their reasonable belief that it was validly issued. United States ex rel. Johnson v. Rundle, 404 F. 2d 42 (3d Cir. 1968). This is especially so since, as found above, the PSP had probable cause to take Senk into custody. United - States v. Miles, 468 F.2d 482 (3d Cir. 1972).

### (c) The Pretext Argument

It remains to be considered whether the McKean County warrant was used as a mere pretext or sham to bring Senk under the control of the PSP. In Taglavore v. United States, 291 F.2d 262 (9th Cir. 1961)[52] the police, suspecting the defendant of a narcotics offense, arrested him on a warrant charging him with two minor traffic offenses. Although the officer who supplied the information for the warrant had witnessed the traffic violations on the previous night, the defendant was not arrested until the next day when the police were aware that there was an excellent chance that the defendant would have marijuana in his possession. The Court concluded that defendant's arrest was a mere subterfuge of defendant's Fourth Amendment rights and held that the evidence gathered as incidental to that arrest should have been suppressed. As explained in United States v. Tillery, 332 F.Supp. 217, 219 (E.D.Pa.1971), aff'd. sub nom. United States v. Smith, 468 F.2d 381 (3d Cir. 1972) (per curiam): the arrest of the defendant in Taglavore "by the members of the vice squad for a minor traffic violation was so extraordinary that the Court of Appeals found

---

50. As noted above, Senk was arrested as he stepped out of an outside public phone booth. Moreover, it bears noting that even though Lt. Stanton testified at trial that he decided to have Senk picked up on January 15, 1962, the date he took charge of the investigation, he did not order the arrest of Senk until January 18, 1962. At that point in time, the reports from the teams of officers which he had dispatched to reinvestigate the previous crimes with which Senk had been charged had already filtered back to him. And no arrangements were made to have Senk picked up until after the two warrants, from McKean and Union Counties, had been obtained. But even after all that had occurred, the PSP were not certain about Senk's whereabouts until after he had made the 5:00 P.M. phone call.

51. Pennsylvania law is in accord. See Commonwealth v. Kenney, 449 Pa. 562, 297 A.2d 794 (1972) and cases cited therein.

52. Cf. United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), where the Court noted that:

"Respondent argued below that Jenks (the arresting officer) may have used the subsequent traffic violation arrest as a mere pretext for a narcotics search which would not have been allowed by a neutral magistrate had Jenks sought a warrant. The Court of Appeals found that Jenks had denied he had any such motive, and for the purposes of its opinion accepted the government's version of that factual question, since even accepting that version it still found the search involved to be unconstitutional. 471 F.2d, at 1088 n. 3. We think it is sufficient for purposes of our decision that respondent was lawfully arrested for an offense, and that Jenks' placing him in custody following that arrest was not a departure from established police department practice . . . We leave for another day questions which would arise on facts different from these."

that the traffic warrant was used as a mere pretext to search Taglavore for marijuana cigarettes and ordered the evidence excluded." In this case, petitioner points to the hurried attempts of the PSP to obtain a warrant for Senk's arrest on January 18, 1962. In particular, petitioner quotes Maj. Stanton as emphasizing to the District Attorney of Beaver County that it was important that Senk be picked up on some charge other than the murder of Jane Benfield.[53] However, I am of the opinion that Maj. Stanton's concern over the immediate arrest of petitioner on some charge or any charge must be read in light of his testimony at the federal hearing wherein he concluded that he did not feel that he had enough information to justify arresting Senk for the murder of Jane Benfield. Stanton's concern, as he expressed it, was to find some legal means of taking Senk into custody. And before he acted, he ordered his subordinates to reinvestigate several cases where the issuance of a warrant would be justified. Although the McKean County and Union County warrants were not obtained until January 18, 1962, they were not issued for minor offenses; they, in fact, charged Senk with assault and battery with intent to ravish, and with indecent assault.[54] Because of that, I believe Taglavore v. United States to be distinguishable. As stated in United States v. Smith, supra, 468 F.2d at 382:

"In this appeal as the trial judge pointed out, United States v. Tillery, D.C., 332 F.Supp. 217, there was a warrant issued prior to the time of the bank robbery. The offense described was not a petty summary matter like the traffic violation in Tagla-

vore. This was no fabricated warrant and it had been valid and existing for a considerable period but had, up until this time, merely fallen short of enforcement."

Accordingly, I conclude that the reason the PSP did not seek an arrest warrant charging Senk with murder was because they felt they did not have probable cause, when in fact probable cause did exist; and that, although Senk may have been taken into custody primarily to interrogate him for the murder of Jane Benfield, his arrest was validly executed upon the above warrants.

## II. THE FIFTH AMENDMENT CLAIM

Petitioner next contends that his confession should not have been introduced into evidence at trial since the circumstances attending his interrogation rendered it involuntary.

Senk was tried and convicted before a jury on April 5, 1962, prior to the announcement by the Supreme Court of its decision in Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) and Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Since those decisions were held not to apply retroactively in Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), this Court must undertake an examination of the facts to ascertain whether, under all the circumstances, petitioner's confession was extracted from him in violation of the Due Process Clause of the Fourteenth Amendment. At the outset, it must be recognized, as spelled out in Culombe v.

53. See n. 23, supra.

54. At the federal hearing, Detective Bundy testified that on January 19, 1962, about 9:30 A.M. he shoved the McKean County warrant across a table toward Senk and said

that he had a warrant for Senk's arrest. It does not appear that Senk was ever served with the Union County warrant. However, Senk was never prosecuted on either of the two charges.

Connecticut, 367 U.S. 568, 601, 81 S.Ct. 1860, 1878, 6 L.Ed.2d 1037 (1961) that:

"No single litmus-paper test for constitutionally impermissible interrogation has been evolved: neither extensive cross-questioning—deprecated by the English judges; nor undue delay in arraignment—proscribed by *McNabb* (v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943)); nor failure to caution a prisoner—enjoined by the Judge's Rules; nor refusal to permit communication with friends and legal counsel at stages in the proceedings when the prisoner is still only a suspect—prohibited by several state statutes."

Reduced to relevant considerations, the facts established that Frank Earl Senk was a 29-year old high school graduate with an above average IQ of 133. He served in the Navy and was married twice. His first marriage produced two children and ended in divorce. At the time of trial, he was married to his second wife, with whom he had a third child. He was also no stranger to the criminal courts, law enforcement officials and their processes.

After his arrest, Senk was held in custody for about 53 hours, from 9:15 P.M. on January 18, to 2:00 A.M. on January 21, before he confessed. Police interrogation, however, did not commence until 4:30 A.M. on January 19. During the interval between his arrest and that time, the PSP did not attempt to question him. Rather, upon his arrival at the Warren Substation shortly after his arrest, Senk was placed in a room apart from his wife where he appeared to fall asleep. Later, at about 1:25 A.M. on January 19, Senk spoke with his wife at which time he told her to return to their motel room in Jamestown, N.Y. Senk was then transported by car to the Ridgeway Substation. The trip took approximately an hour and twenty minutes during which time Senk appeared to sleep. Upon arrival at Ridgeway, he was served coffee and snacks.

On January 19, the PSP, operating in teams of ones and twos, intermittently questioned Senk from 4:30 A.M. until 5 or 5:30 P.M. Initially, the questioning centered around Senk's past sex life in general and then turned to his alleged involvement in the assault on Mrs. Flanders. At 10:00 A.M., the questioning was suspended while Senk ate. After that, the interrogation resumed and continued until shortly after noon when the officers went out to lunch. They returned at 1:00 P.M. and did not again question Senk until after 1:30 P.M. when he finished eating the sandwiches which he had requested. All conversation with Senk terminated at 5 or 5:30 P.M.

At 7:00 P.M., Senk was taken to the Elk County Jail for the night where he was served hamburgers and milk. He was awakened at 7:30 A.M. the next morning, served breakfast and returned to the Ridgeway Substation at 9:45 A. M. The periods of interrogation on January 20 were much less prolonged than they were on January 19. At 10:00 A.M., petitioner met with a laboratory technician and agreed to give a blood sample. Thereafter, he spoke with a PSP polygraph examiner for about an hour. Senk, however, refused to submit to a polygraph examination, and after the polygraph examiner left, Senk spoke with Stanton for about 15 minutes, after which Stanton, at Senk's request, called a Methodist minister to visit Senk.

At 1:00 P.M., Senk was served sandwiches and milk which he ate while waiting for the minister who arrived at about 1:30 P.M. Senk and the minister then spent "between a half hour and an hour" behind closed doors. The minister left about 3:00 P.M. at which time various officers resumed their discussions with Senk along religious lines until sometime between 5 and 6:00 P.M. From that point on, the officers did not again interrogate Senk.

At 6:00 P.M., Senk called the minister and asked him to return to the Substation. Between 6 and 7:00 P.M., Senk was served supper. After conferring with the minister, Senk was taken to a bedroom at 8:30 P.M. where he appeared to sleep until 12:30 A.M. on January 21 when the minister returned. At 1:00 A.M., Senk's wife and mother arrived, and for approximately the next 35 minutes, Senk conferred privately with his wife, mother and the minister. At the end of that period, Senk told Stanton of his involvement in the murder of Jane Benfield.

Despite the duration of petitioner's custody, the trial judge found that he was not exposed to force, violence, threats or ill treatment. The periods of interrogation were interspersed with lunch breaks and other short periods of rest. Petitioner was afforded ample opportunity to sleep, and it appears that he in fact did sleep during those periods. While the periods of interrogation on January 19 were rather prolonged, such was not the case on January 20. And most importantly, throughout the time that he was in custody, petitioner did not show any signs of wear and tear.

Of course, it cannot be ignored that petitioner was not afforded the assistance of counsel and that he was not granted a preliminary hearing until after he confessed. On the other hand, the trial judge noted that petitioner was fully aware of his rights. In addition, the opening paragraph of his written statement warned him that his confession could be used against him. Moreover, the trial judge found that petitioner did not request legal assistance, and neither his wife nor his mother made any attempt to secure counsel for him.

It must also be emphasized that although petitioner may have been secluded at some remote outpost, he was not kept incommunicado. Shortly after his arrest, but before any attempt was made to question him, petitioner was allowed to speak briefly with his wife. On the afternoon of January 20 and again during the early evening hours, petitioner was allowed to confer with a minister he had requested to see. After speaking with the minister on the second occasion, Senk was able to sleep for several hours. Finally, before petitioner confessed, he spoke privately with the minister, his wife and his mother.

This, then is not a case where the suspect was: subjected to physical brutality and mental terror, Brown v. Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L. Ed. 682 (1936); was exposed to fear of mob violence and persistent and repeated questioning for about a week, Chambers v. Florida, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716 (1940); driven from county to county for three days in an attempt to seclude him, and threatened with mob violence, Ward v. Texas, 316 U.S. 547, 62 S.Ct. 1139, 86 L.Ed. 1663 (1942); held incommunicado and interrogated persistently for 36 hours without sleep or rest, Ashcraft v. Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944); an adolescent who was refused the assistance of counsel, Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948); subjected to a pattern of persistent questioning over a five-day period without a proper diet and allowance for sleep, Watts v. Indiana, 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801 (1949); detained incommunicado for four nights and five days, interrogated by relays of policemen and denied a preliminary hearing, Turner v. Pennsylvania, 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810 (1949); apparently schizophrenic and highly suggestible, with a third-grade education. Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957); an illiterate mental defective of the moron class, highly suggestible and subject to intimidation, Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); a mentally dull, highly suggestible, 19-year old, with a fifth-grade education who was held incommunicado with very little food for three days, and denied a preliminary

hearing, Payne v. Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958); held incommunicado for sixteen hours, in spite of repeated demands to be allowed to call his wife or an attorney, and denied a hearing until he acceded to police demands, Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); a foreign-born man with a junior high school education who was subjected to continuous and persistent questioning for eight hours, after repeatedly requesting and being denied counsel whom he had retained, Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959).

 Standing alone, none of the circumstances enumerated in the facts would suffice to justify a conclusion that petitioner's confession was coerced. Due process of law does not condemn the mere questioning of a suspect while in police custody, Lisenba v. California, 314 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166 (1941). Nor was petitioner, having been tried prior to the decisions in Escobedo v. Illinois, supra, and Miranda v. Arizona, supra, entitled to the assistance of counsel while being so interrogated, Crooker v. California, 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed.2d 1448 (1959), although the absence of counsel at that stage certainly bears close scrutiny, Procunier v. Atchley, 400 U.S. 446, 453, 91 S.Ct. 485, 27 L.Ed.2d 524 (1971); Clewis v. Texas, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967); Davis v. North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966). The same is true of the failure of the police to grant petitioner a hearing promptly after his arrest, even if such was required under state law. Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957).

 Even when all of those factors are grouped into the matrix of this case, I still do not believe that petitioner's will was so overborne as to render his confession involuntary. Petitioner, it bears repeating, possessed a higher than normal intelligence and had previously been exposed to the criminal process. Cf. United States ex rel. Dickerson v. Rundle, 430 F.2d 462 (3d Cir. 1970). He had also received the benefit of a formal high school education. See Crooker v. Alabama, supra, and cf. Spano v. New York, supra. Although confined for a relatively lengthy period, he was not held incommunicado, cf. Darwin v. Connecticut, 391 U.S. 346, 88 S. Ct. 1488, 20 L.Ed.2d 630 (1968); Davis v. North Carolina, supra; United States ex rel. Monks v. Warden, 339 F.Supp. 30 (D.N.J.1972), aff'd. 474 F.2d 1337 (3d Cir. 1972); and he was not deprived of food or sleep, cf. Greenwald v. Wisconsin, 390 U.S. 519, 88 S.Ct. 1152, 20 L. Ed.2d 77 (1968); United States ex rel. Burns v. LaVallee, 436 F.2d 1352 (2d Cir. 1970). Moreover, throughout the interrogation, petitioner remained calm and composed. Cf. United States ex rel. Smith v. Yeager, 336 F.Supp. 1287 (D. N.J.1971), aff'd. 451 F.2d 164 (3d Cir. 1971). And at his request, petitioner was permitted to speak with a minister, his wife, and mother. Cf. United States ex rel. Loray v. Yeager, 446 F.2d 1360 (3d Cir. 1971). Petitioner, however, attempts to turn the minister into a tool of the police, but the evidence on that point, it seems to me, was extremely vague and attenuated. While Rev. Cousins did express his desire to cooperate with the PSP, he also stated that his religious background would prevent him from revealing the details of his conversation with Senk. The inference that I have drawn from this is that the minister was willing to offer religious solace to petitioner, and if such would be of assistance to the state police, then he would be willing to help. It does not appear that the minister resorted to trickery, cajolery or deception in order to extract a confession. When viewed in conjunction with the other circumstances, I believe the presence of the minister offset the coercive influences exerted by petitioner's custody and interrogation. See Commonwealth v. Graham, 408 Pa.

155, 182 A.2d 727 (1962). Finally, when petitioner finally decided to confess, he exclaimed his desire in a spontaneous manner. There is no indication that he did so hesitantly or haltingly. And after it was typed, he made certain corrections and appears to have readily signed it in spite of the warning in the opening paragraph as to the use to which his confession would be put. Accordingly, I conclude as did the courts that previously considered this identical issue, that petitioner's confession was not the product of an overborne will and that it was voluntarily given.

## III. THE EVIDENTIARY CLAIMS

■ Finally, petitioner contends that references at his trial to his past criminal record [55] and his refusal to submit to a polygraph examination [56] were so prejudicial as to constitute a violation of due process. I do not agree. In the first place, the trial judge ordered the references to petitioner's criminal history stricken from the record,[57] see United States v. McCoy, 472 F.2d 704 (6th Cir. 1973); United States v. De Larosa, 450 F.2d 1057 (3rd Cir. 1971), and instructed the jury "that no adverse inference may be inferred by the jury from the defendant's refusal to take (the polygraph examination)," [58] cf. Bowen v. Eyman, 324 F.Supp. 339 (D.Ariz.1970). Furthermore, in view of the evidence adduced at trial, including petitioner's written confession and his statements to the PSP reconstructing the crime, I conclude that the errors were harmless beyond a reasonable doubt. See Milton v. Wainwright, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972); Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Yarnal v. Brierley, 468 F.2d 816 (3rd Cir. 1972).

Accordingly, for the reasons expressed above, petitioner's application for a writ of habeas corpus will be denied.

There is probable cause for appeal.

---

55. On cross examination, Det. Sgt. Rufus Williams testified:

"A. Yes, sir; we had a conversation about psychiatric care and I asked the defendant, Frank Earl Senk, if he received any psychiatric treatment when he was in prison in Florida for having put the knife at the throat of a woman." Trial Notes at 1033-34.

And on direct examination, Lt. Willard Stanton testified:

"A. We talked about his condition . . . he wanted to talk about psychiatric treatment, and I told him that I was not a competent psychiatrist; in fact, I had no knowledge of it whatever. He went into the background of his life. He told me of his unnatural sex relations . . . ." Trial Notes at 1107.

56. On direct examination of Corporal Charles Baker, the following exchange took place:

"Q. Did you question the defendant as to whether he would submit to a polygraph examination?

A. Yes sir, I did.

Q. What was his answer?

A. He refused to submit to the Polygraph examination.

Q. Did he give you any explanation for that?

A. He just said he couldn't."
Trial Notes at 1055.

57. With regard to the references to petitioner's past criminal record, the Pennsylvania Supreme Court, in Commonwealth v. Senk, (1962), 412 Pa. 184, observed, at 193-194, 194 A.2d 221 at 226:

"Finally, the defendant (Senk) asserts that the court erred in refusing to withdraw a juror when two witnesses made references in their testimony to facts indicating that the defendant had previously been in prison in the State of Florida, and had been guilty of unnatural sex relations. These irrelevant and incompetent statements were stricken from the record by the trial judge, and the jury emphatically instructed to disregard them. Under all the attending circumstances, the situation is not such as to require a new trial. We are of the opinion that no prejudice resulted and that the objectionable testimony had no influential effect. See, Commonwealth v. Fugmann, 330 Pa. 4, 198 A. 99 (1938)."

58. Trial Notes at 1422-23.